**Ronald William GREENFIELD,
Petitioner,**

v.

**A. T. ROBINSON, Acting Superintendent,
Virginia State Penitentiary,
Respondent.**

Civ. A. No. 76–5.

United States District Court,
W. D. Virginia,
Charlottesville Division.

April 12, 1976.

1114

Gilbert W. Haith, Asst. Atty. Gen., Richmond, Va., for respondent.

Ronald William Greenfield, pro se.

## OPINION and JUDGMENT

DALTON, District Judge.

Ronald William Greenfield was convicted on June 16, 1973 of the second degree murder of Mary Frances Jordan by a jury in the Circuit Court of the City of Charlottesville. The conviction followed a highly publicized and somewhat bizarre trial in which Greenfield was ably represented. He was sentenced to serve twenty years in the Virginia State Penitentiary. He subsequently appealed this conviction to the Supreme Court of Virginia which affirmed it in a written opinion of the court. *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974).

He now has filed a petition for a writ of habeas corpus in this court pursuant to 28 U.S.C. § 2254. This court has jurisdiction over such actions under 28 U.S.C. § 2241. He makes the following arguments:

1) Petitioner's underwear was illegally seized at the Charlottesville City Jail and used as evidence.

2) Petitioner should have been granted a change of venue due to prejudicial pretrial publicity.

3) The trial court ought to have allowed the defendant to call the prosecutor as a witness since he had knowledge of facts concerning the murder weapon.

4) The trial court should have allowed the defendant to testify while under hypnosis.

5) The trial court failed to allow a defense witness to testify as to matters related to him by the defendant while the defendant was under hypnosis.

6) An illegal confession was introduced into evidence.

7) The trial court failed to strike for cause a member of the jury who had previously been involved in a crime similar to the one for which the petitioner was standing trial.

Four of petitioner's contentions were raised in his direct appeal to the Virginia Supreme Court and considered by that court. Respondent concedes that petitioner has properly exhausted his state court remedies for these claims. *Grundler v. North Carolina*, 283 F.2d 798 (4th Cir. 1960). As to the other three claims, these allegations have not been raised by way of direct or collateral review in the state court. However petitioner's time for noting a direct appeal has passed, § 8–489, Va.Code Ann. (1950). Thus, petitioner does not have an available direct remedy that he may seek in the state courts. *Fay v. Noia*, 372 U.S. 391, 82 S.Ct. 1140, 8 L.Ed.2d 274 (1963).

Furthermore, under 28 U.S.C. § 2254 if there is an absence of available state corrective processes, a federal court may proceed to the merits of a habeas corpus applicant's claims without requiring exhaustion. Under recent Virginia Supreme Court rulings, habeas corpus relief in Virginia cannot extend to alleged trial defects, that were not raised at trial and pursued on appeal unless they be jurisdictional defects or inadequacy of counsel.

*Superintendent v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974). By implication then, state habeas corpus relief is not to serve as a substitute for direct appeal and will not lie for nonjurisdictional defects raised at trial, but not pursued on direct appeal. *Brooks v. Peyton,* 210 Va. 318, 171 S.E.2d 243 (1969), *Superintendent of Virginia State Farm v. Jackson,* 215 Va. 251, 208 S.E.2d 739 (1974).

Petitioner's allegation that one of the prospective jurors ought to have been struck for cause has never been raised before. Clearly there are no available state corrective processes for such an allegation. Petitioner's claims of an illegal confession and that he should have been permitted to call the prosecutor were raised at trial, but not pursued on appeal. It appears that this decision to forego raising these issues on appeal has foreclosed the availability of a state corrective process. Accordingly, this court will proceed to consider the merits of each of petitioner's allegations.

### FACTS

The crime in question was committed in the early morning hours of November 8, 1972. The defendant and the deceased had left Poe's, a popular student's night spot near the University of Virginia campus where they were both employed. The testimony at the trial indicated that the deceased had offered the defendant a ride to his apartment as it was raining heavily. The defendant apparently lent the deceased his green army-type jacket to wear while she went to the parking lot to get her car. The defendant waited under the awning in front of Poe's to be picked up. After the deceased picked him up, she drove to his apartment and past it where she stopped in a well-lit area in a church parking lot. There the two talked for about fifteen minutes and she criticized his recent excessive drug use. At first he was disturbed by this criticism, but the conversation ended on a friendly note. As the defendant reached to put his coat on, which was lying between him and the decedent on the front seat of the car, he simultaneously moved to get out of the car. However, he testified that he felt a falling sensation and became unconscious of the succeeding series of events. On regaining consciousness, he found himself on the ground several feet from the car. The decedent was lying motionless on the driver's side of the car in a pool of blood. The defendant's pocket knife, the apparent murder weapon, was lying on the floor of the vehicle. The defendant picked the knife up and at this time noticed that his hand was bleeding. He testified he heard a voice yell "Hey," but when he turned to look he did not see anyone. He then fled to a house denominated the "ghost house" by the prosecution where he sought financial assistance to leave the area. When no money was forthcoming, he hitchhiked a ride to a first aid station about ten miles from Richmond and later went to the Virginia Commonwealth University campus in Richmond.

While appellant was fleeing to the ghost house and beyond, a college student emerged from a house across the street from the church parking lot because he thought he heard someone screaming "Mother, Mother." As he left his apartment he observed a young man wearing an olive army coat running from the parking lot. He later described this man as from five feet eleven inches to six feet tall, about 190 pounds, clean shaven, without glasses. The defendant at the time of the murder was five feet seven to five feet eight inches tall, weighed no more than 160 pounds, wore glasses, and had a large fu-mancho beard-mustache.

After observing this fleeing individual, the student found the deceased, still alive, and he carried her back to his apartment whereupon a roommate called the rescue squad. The decedent was taken to the University Hospital for emergency surgery which was unsuccessful. An autopsy revealed that the cause of death was multiple stab wounds.

During the day of November 8, 1972, the defendant was arrested at a hospital in Richmond, where he had sought medical attention for his hand. While in custody, the defendant was given his Miranda warn-

ings, but he proceeded to give the police a statement of confession. He indicated that the preceding evening he had shot some heroin and had taken a capsule of psilocybin, a hallucinogenic drug. He admitted to being in the vehicle with the decedent, but had no memory of killing her. There was a conflict in the testimony as to whether he admitted that he killed the victim or that he "must have done it."

When appellant was being transported back to Charlottesville, he made a controversial statement to the effect that he didn't feel bad about taking the girl's life. There is a slight conflict of testimony among the officers who heard this statement. Upon arriving at the Charlottesville jail, the police gave the defendant some clean clothes and took from him the clothing he was wearing. Bloodstains of both the deceased's and the defendant's blood type were found on this clothing and his undershorts were introduced into evidence.

At trial, the defendant relied on the defense of unconsciousness. He repeated that he had used heroin and a hallucinogenic drug on the night of November 7th. He also indicated that he had been sick for the entire week before that night. Dr. Kenneth R. Locke, a psychiatrist, testified that he had interviewed the defendant and attempted to diagnose his medical condition. He indicated that he had hypnotized the defendant in an effort to make him recapture his memory of events of the night in question. After considering the defendant's school and medical records, the report of another psychiatrist, and talking with the defendant's parents and sister, Dr. Locke stated that he considered as diagnoses an "adolescent adjustment reaction" and possibly "minimal brain damage from birth trauma." Dr. Locke expressed his opinion that the defendant was unconscious at the time of the homicide but he did not express an opinion as to the cause of this unconsciousness.

While counsel were arguing out of the jury's presence over the admissibility of the statements made by the defendant to Dr. Locke, the defendant's attorney stated his intention to call the defendant to the stand while in a hypnotic trance and have him questioned by Dr. Locke for the purpose of extracting greater details from the defendant than he would normally be able to remember. The trial judge refused to permit this procedure. The trial judge also refused to permit Dr. Locke to state what the defendant had said to him while under hypnosis and what members of the defendant's family had told him. For the record, Dr. Locke revealed that while under hypnosis the defendant had recounted the series of events in a manner consistent with his previous statements, but in much greater detail. This account of the night in question included a clearer description of the conversation between Greenfield and Jordan in the church parking lot and a memory of having seen the man who yelled "Hey" at him as being bigger than him and wearing a jacket that looked very much like his own. Dr. Locke also stated that the defendant told him that he chased after this man until he came to a junction where he decided for unknown reasons to give up the chase.

During the trial, the defense attorney maintained that the victim's stab wounds were from eight to ten millimeters long, while the defendant's knife introduced into evidence was between thirteen and fourteen millimeters. Having information that another knife, possibly connected with the crime, had been turned over to the Commonwealth's Attorney, the defense attorney requested to call the prosecutor to the stand. The prosecutor stated that a careful investigation had revealed that the other knife had nothing whatsoever to do with the case. Accordingly, the trial judge ruled that the prosecutor's opinion would be irrelevant and didn't permit him to be called to the witness stand.

The jury was instructed by the trial judge that unconsciousness is a state of mind on an individual's part which renders him not conscious of his actions. The jury was further instructed that an involuntary state of unconsciousness would be a complete defense to a criminal charge, but a

voluntary state of unconsciousness would only reduce the homicide from first to second degree murder. On these facts, the jury returned a second degree murder conviction and fixed the defendant's punishment at twenty years imprisonment.

## DISCUSSION OF LAW

█ Petitioner's first contention concerning the illegal search and seizure of his undershorts is without merit. The United States Supreme Court has recently ruled that a warrantless seizure of a detained suspect's clothing at a city jail approximately ten hours after the suspect's arrest is constitutionally permissible provided the arrest is lawful and probable cause exists for believing that the clothing would reveal incriminating evidence. *U. S. v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). In the case at hand, there is no question that the defendant's arrest was valid. Being the suspect in a bloody knifing incident, certainly there was cause to believe bloodstains relevant to solving the case might be contained in the clothing. The taking of petitioner's clothing was a normal incident of a custodial arrest. The defendant agreed to turn over his undershorts to the police at the request of a police officer and the officer did not make the request on the pretext of having any warrant. The fact that the articles of clothing were evidence of the crime did not mandate the law enforcement authorities to subsequently seek a warrant. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). This claim is to be dismissed.

Petitioner's second claim concerning pretrial publicity was the subject of an extensive pretrial hearing at which defendant moved for a change of venue. This motion was denied. Defendant renewed the motion at trial and again it was denied. Petitioner maintains that this pretrial publicity biased the jury.

█ It is a constitutional principle that an accused receive a trial by a fair and impartial jury free from outside influences. If pretrial publicity raises the reasonable likelihood that the accused has been prejudiced in his right to a fair trial, the trial court is obligated to take appropriate steps to determine if the accused can secure a fair trial. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

█ Whether there has been such pretrial publicity requiring action by the court is to be determined by an evaluation of the "totality of the surrounding facts." *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). However the mere fact of pretrial publicity is not the evil to be remedied by a change of venue. It is adverse publicity in the face of a showing that the jurors were biased from it that requires affirmative preventive action. *Wansley v. Slayton,* 487 F.2d 90 (4th Cir. 1973).

The burden was on the defendant to demonstrate that he could not obtain a fair trial in Charlottesville. He attempted to do so by calling two investigators who had polled public opinion on the matters. Their investigation revealed that about three in every ten persons polled did not believe the defendant could receive a fair trial while three in every ten did think the defendant could get a fair trial. Four in every ten persons polled expressed no opinion. The defendant also submitted the affidavits of some of those polled. These affidavits stated the affiant's beliefs that defendant would not be able to receive a fair trial. The defendant also introduced into evidence numerous newspaper articles and made much of the fact that the newspapers had printed the confession of a seventeen year old.

The prosecutor attempted to rebut this showing by submitting some affidavits he had taken from acquaintances and by calling a former editor of the Charlottesville paper who testified that he was not aware of the facts of the case. The prosecutor emphasized that the newspaper accounts were generally accurate and that the defendant's confession was printed only because the defendant had misrepresented himself to be over eighteen. He also emphasized that the confession was a valid one

and not one that would later be suppressed after being printed in the paper.

A large jury pool was called for the case. All twelve of the jurors who eventually served on the jury had read or heard about the case, but generally their knowledge was limited. Each one stated his position to be unbiased and believed that he could render a fair verdict. Only one of the jurors mentioned her awareness of defendant's confession, but she went on to state that it did not affect her opinion because she had read that the defendant had allegedly made the confession while on drugs and she thought that the defendant was entitled to a fair trial.

On these facts, this court is of the opinion that the petitioner was not denied the fundamental due process of the law. The trial was well-conducted and there was no carnival-like atmosphere to prevent a fair determination of guilt or innocence. *Sheppard v. Maxwell, supra.* The jury pool was not so impregnated with bias as to mandate a change of venue. None of those eventually serving on the jury expressed an opinion as to guilt or innocence before the trial began. At most then, we have a jury pool not totally ignorant of the facts and issues involved. However mere knowledge is not sufficient to warrant a change of venue. *Irvin v. Dowd, supra* at 723, 81 S.Ct. 1639. The newspaper accounts were fairly accurate. The mere fact that petitioner's confession was printed cannot alone mandate a change of venue for to adopt such an inflexible rule would be to overlook the conflict between a free press and a fair trial.

A better rule is to weigh the printing of a defendant's confession as just one ingredient in deciding whether to change venue. All indications are that the publishing of the confession was fairly accurate. The confession itself was later admitted into evidence and no one serving on the jury admitted a special prejudice resulting from its publicity. A careful review of the record in this case leaves this court with the conclusion that the trial judge didn't abuse the defendant's constitutional rights in de-nying his motion. This claim is therefore dismissed.

Petitioner's next contention is that he should have been permitted to call the Commonwealth's Attorney to the witness stand to testify concerning a statement that he allegedly made about the murder weapon. During the investigation of the incident, the Commonwealth's Attorney was given another knife besides the petitioner's as a possible murder weapon. The Commonwealth's Attorney properly informed defense counsel of this, but on investigation by the prosecution this new knife was discovered to be of no significance. Nevertheless the defense felt that the prosecutor had an opinion about the murder weapon and that the basis of this opinion would be relevant to the case. The trial judge disagreed and refused to permit the defense to call the Commonwealth's Attorney as a witness.

The scope of this court's review of alleged state law errors concerning the admissibility of evidence was outlined in *Grundler v. North Carolina,* 283 F.2d 798 (4th Cir. 1960). There the Fourth Circuit held that:

"Normally the admissibility of evidence, the sufficiency of evidence, and instructions to the jury in state trials are matters of state law and procedure not involving federal constitutional issues. It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented. The role of a federal habeas corpus petition is not to serve as an additional appeal."

This court readily concedes that a criminal defendant has a constitutional right to confront and examine witnesses on relevant exculpatory matters. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). However the right of confrontation is not absolute and may in appropriate cases bow to accommodate other legitimate interests in the criminal trial process. *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In the case at hand, there were strong assurances by the prosecutor that he had no

relevant information to relate concerning the possibility that another knife was the murder weapon. The prosecutor even agreed to stipulate the source of this second knife and his opinion that it did not originally come from the defendant. However he recognized that the basis of his opinion would be hearsay. The defense still maintained they should have been permitted to call the prosecutor to the witness stand.

Such evidence if entered would have only confused the jury. Certainly if the defense had positive evidence of another murder weapon they were entitled to present it, but no such evidence was ever proffered. The only evidence the defense offered was the negative inference that arose from the fact that the knife wounds were not as long as the knife blade. To inquire about an opinion that the prosecutor no longer entertained would have served the defendant no purpose. This court does not believe that the trial judge made an evidentiary mistake that violated defendant's constitutional rights.

Defendant's next two claims also concern evidentiary rulings. The trial judge refused to permit the defendant to testify while in a hypnotic trance or the defendant's expert witness to testify concerning statements the defendant made to him while in a hypnotic trance. This court must admit that these contentions present interesting and novel issues before this court. However within the scope of its review, this court cannot conclude that these rulings denied petitioner his constitutional rights.

Petitioner's argument at the State Supreme Court level was that hypnotic evidence ought to be permitted in limited situations. The defense argued that this was one such situation because there was no direct evidence concerning the night in question and the only witness who could tell the court about the incident had had a lapse of memory. Thus to permit the introduction of hypnotic evidence would merely have allowed the defendant to fully develop his defense. The defense cited *Chambers v. Mississippi, supra,* in support of their constitutional argument.

In *Chambers v. Mississippi, supra,* the U.S. Supreme Court found that Mississippi's application of the "voucher" and hearsay rules of evidence had combined to deny the defendant in a murder case, an opportunity to cross-examine a man who had made prior oral and written confessions to the murder. The court specifically limited its holding to the facts and circumstances of the case at hand. An examination of these circumstances reveals that the defendant in *Chambers* had already taken some steps at trial towards demonstrating that this other man was in fact the murderer by attacking his alibi and by presenting an eyewitness who stated it was this man and not the defendant who committed the crime. Furthermore, there was every reason to believe the man's written confession was reliable as it was corroborated orally. In essence then the rules of evidence as strictly applied by the Mississippi courts did not serve the ends of justice.

 This case does not have similar circumstances. Here there were no eyewitnesses and only minute evidence to suggest that the defendant did not commit the crime. Even more important, there is no reason to suggest that the excluded evidence is reliable. Indeed the very reason for excluding hypnotic evidence is due to its potential unreliability. See Herman, "The Use of Hypno-Induced Statements in Criminal Cases," 25 Ohio St.L.J. 1, 27 (1964); "Hypnosis, Truth Drugs and the Polygraph; An Analysis of the Use and Acceptance By the Courts," 21 U.Fla.L.Rev. 541, 558 (1969). While this court lumped into the same category as polygraphic evidence for purposes of declaring such evidence unreliable, still there is a recognized majority of states that exclude statements made while under a trance. *State v. Harris,* 241 Ore. 224, 405 P.2d 492 (1965); *People v. Modesto,* 59 Cal.2d 722, 31 Cal.Rptr. 225, 382 P.2d 33 (1963). This court knows of no rule that requires a judge to accept evidence of uncertain value to go to a defense that is otherwise completely uncorroborated. The mere fact that a crime has no eyewitnesses or direct evidence does not warrant a court to accept evidence that may be able to tell

the trier of fact something about the crime, but may also be of dubious quality. As a constitutional principle then, this court simply finds that petitioner's due process guarantees were not abrogated by the trial court's refusal to permit the defendant to relate his story under hypnosis or an expert witness to recount what the defendant told him while under hypnosis.

Defendant's next contention concerning an alleged illegal confession has two aspects to it. Defendant first argues that the confession was illegal because it was taken while the petitioner was under the influence of drugs. Secondly he submits that since he was a minor at the time the statement was made and his parents were not present that he did not make a knowing and intelligent waiver of his right to remain silent. Petitioner's transcript reveals that these claims are factually inaccurate.

█ The defendant's confession was the subject of a pretrial motion to suppress. The record of this pretrial hearing does indeed reveal that petitioner was between the age of seventeen and eighteen at the time of his arrest. However the charge that he was under drug influence at the time he made his statement is totally unsubstantiated. Detective Harry Duke of the Richmond Police testified at this pretrial hearing that he first confronted the defendant at McGuire Clinic at St. Luke's Hospital in Richmond on the afternoon of November 8, 1972. The defendant was having his hand treated by a doctor at the time. Detective Duke testified that when he first confronted the defendant, the defendant gave him a false name. Upon identifying himself as a police officer, Detective Duke stated his purpose for being there and informed the defendant that he was under arrest. He then read the defendant his Miranda warnings. The defendant, upon inquiry, told Detective Duke that he was twenty-one. Detective Duke testified that the defendant appeared perfectly normal and did not appear to be under the influence of anything.

Two other Richmond policemen who accompanied Detective Duke to the McGuire Clinic, Detective Roger O'Brien and Detective Anis Blair, also stated their beliefs that the defendant was not under the influence of anything at the time of his arrest. Detective Duke further testified that the three police officers accompanied the defendant to the police headquarters. At that time, he was again advised of his rights and he gave the police officers his correct name and age. Detective Duke requested his parents' address, but he continually repeated that he did not want to get his parents involved and that he wanted to make a statement of confession without his parents being there. He subsequently made this confession. Later in the afternoon, he was taken back to Charlottesville, by Officers Rittenhouse and Baird of the Charlottesville Police Department. Officer Rittenhouse also testified at the pretrial suppressions hearing. He stated that on the way back to Charlottesville, he discussed the local drug culture in Charlottesville with the defendant, but that the defendant did not say anything about his being under the influence of drugs.

█ Under these facts, this court can find no indication that the defendant was under the influence of drugs when he made his confession. Admittedly, the defendant did state in his trial testimony that he got high on some marijuana cigarettes at the Virginia Commonwealth University Campus. However he stated this was earlier in the day of November 8, 1972. Furthermore, he did not take the stand in the pretrial hearing to refute the four officers' testimony. The burden was clearly on the prosecution to demonstrate that the statement was knowingly and voluntarily given. However based on the testimony of the four police officers it would certainly appear that the prosecution established that the defendant gave his statement while in a normal state of consciousness.

█ As to the claim that the defendant was underage and the police took advantage of him, again the trial transcript does not bear this out. Detective Duke admitted that he knew that the defendant was only seventeen, but he stressed the fact that he

continually requested the address of the defendant's parents. The defendant persisted in not releasing this address and in giving his statement. He received his Miranda warnings twice.

In *In Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court stated that:

> "If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights of or adolescent fantasy, fright or despair."

On the facts as related, this court is of the opinion that great care was taken in obtaining the defendant's admission. Constitutionally this is all that is required and consequently this claim must be rejected.

Petitioner's last allegation is meritless. Petitioner complains that the trial court failed to strike for cause a member of the jury who had previously been involved in a crime similar to the one for which the petitioner was standing trial. While the petitioner does not specify to whom he refers, it appears from the transcript of the voir dire that only two prospective jurors answered that they had been involved in a similar crime of violence. One of these prospective jurors, Stephen Jamme, had been a witness to an auto accident in which a man was charged with manslaughter. However, he did not serve on the jury.

 The other prospective juror, Carol Blankenship, answered that she had been sexually attacked when she was ten years old. No request was ever made to strike this woman and she eventually did serve on the jury. However she was thoroughly examined by the court about any opinion she might have had in the case, and she stated that she felt that she could be open and fair. She was also examined by the defendant's attorney and stated that her prior experience did not influence her thinking about someone charged with a crime. This careful examination removed all doubts of potential prejudice. *Mares v. United States*, 383 F.2d 811 (10th Cir. 1967), *United States v. Gay*, 522 F.2d 429 (6th Cir. 1975). There was no abuse of discretion by the trial court judge.

Accordingly, this court is of the opinion that this petition for a writ of habeas corpus must be DENIED and DISMISSED. Judgment is herein awarded to the respondent.