THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ADOLPHUS McELROY, Defendant-Appellant.

First District (1st Division)    No. 78-1243

Opinion filed February 11, 1980.

Ralph Ruebner and Rosetta Hillary, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Diane Michel Powell, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Adolphus McElroy, was charged by indictment with aggravated battery. (Ill. Rev. Stat. 1973, ch. 38, par. 12—4.) Following a jury trial, defendant was found guilty and sentenced to three to nine years' imprisonment. Defendant appeals his conviction and sentence, contending (1) that he was not proved guilty beyond a reasonable doubt; (2) that he was not allowed to confront and cross-examine the victim

concerning his alleged bias toward defendant; (3) that the State's closing argument deprived him of a fair trial; and (4) that he is entitled to a new sentencing hearing because the trial court erroneously believed a prior misdemeanor conviction was a felony conviction.

We affirm.

Frank Allen, the victim, testified for the State. On August 2, 1975, at about 10 p.m., he was standing on the porch of a Chicago Housing Authority (CHA) building watching a dice game. Allen saw defendant standing next to a hallway door about 10 or 15 feet away. Defendant pointed a gun toward Allen and shot him in the right shoulder. Allen charged defendant and began a scuffle, causing defendant to drop the gun. When defendant regained possession of the gun, Allen fled around the corner of the building. In the midst of his flight, Allen stumbled over a small boy. While Allen paused to pick up the child, he was shot by defendant again. The second shot grazed Allen's back. He got up and ran again, this time to 35th Street and Cottage Grove Avenue, where he flagged down a patrol car. The police transported Allen to Michael Reese Hospital, where he received treatment.

Allen had known defendant for 10 to 15 years, but could identify him only as "Dolphus."

On cross-examination, Allen testified that he had previously lived about one block from the scene of the shooting. While living in that neighborhood, he had attended Doolittle Grammar School. Allen had three brothers. Allen further testified that on June 12, 1972, one of his brothers was murdered. Luella Harris was charged with the murder. Allen did not know what relationship "Lou" Harris had with defendant and had never seen them in each other's company. Allen knew another member of the Harris family nicknamed "Shine" but no longer associated with that family.

Allen explained that although he knew defendant from the neighborhood and Doolittle School, they did not associate with each other and were not friends. Allen further testified that after his brother was shot by Lou Harris, he had no particular feelings toward defendant. Allen stated that he never saw defendant in the company of Lou or Myron Harris. However, upon further questioning, Allen amended his answer stating that defendant, "Shine" and Myron Harris were "associates" and together on many occasions.

On further cross-examination, Allen related his whereabouts and activities on the day of the incident. Among his activities that day, Allen visited a friend named Glen. At Glen's home Allen drank rum with about five other people. Immediately prior to the incident, Allen visited Janet Coleman, his girlfriend, and played with his daughter. He then returned downstairs where he witnessed the dice game, was confronted by

defendant and a companion called "Erdie." According to Allen, defendant said "I got you, fool nigger" and fired a gun.

Allen denied ever fighting with defendant between the time his brother was shot and he was shot.

On redirect examination, Allen testified that he told the officers he flagged down that Adolphus shot him. He also stated that while he was outside of Glen's home he had a fight with Adolphus. The fight lasted a few minutes and was broken up by a third person.

On re-cross-examination, Allen explained that he had testified that he never had an altercation with defendant because he thought defense counsel's question pertained to the time before his brother was killed.

Earl Townsend testified for the State that on August 2, 1975, he was present with about 15 other people at a dice game in front of a CHA building. Townsend heard a shot and saw Allen and defendant scuffling in the doorway. Allen knocked the gun to the ground and ran when defendant picked it up. Townsend saw Allen stumble over a small child and pick the child up. At this point, there was another shot. Defendant was holding the weapon.

On cross-examination, Townsend described his relationship with Allen as friendly. Townsend testified that he never told any police officer or law enforcement official about the shooting. Townsend had not seen defendant since the shooting, but had seen Allen almost every day. Townsend did not discuss the shooting with Allen, other than to refuse Allen's request that he be a witness.

The parties subsequently stipulated that Townsend testified pursuant to subpoena.

Officer Alan Davis of the Chicago police department testified that on December 19, 1976, he was on duty with his partner in the vicinity of Mr. Ricky's nightclub. Davis observed Allen, the defendant and a security guard engaged in a minor disturbance. Davis noticed that Allen and defendant were "getting loud" and investigated. According to Davis, Allen waved the officers over to the scene. Officer Davis apprehended defendant as he was walking away and subsequently placed him under arrest.

Officer Donald Watkins of the Chicago police department testified that on August 2, 1975, Allen ran up to his squad car "hollering and screaming and full of blood." Allen told the officer he had been shot. During transportation to the hospital, Allen told Watkins that "Dawfus" had shot him. Allen did not know Dawfus' last name or where he lived.

The defense rested without presenting any evidence. The defendant was found guilty of aggravated battery and appeals.

Defendant contends that he was not proved guilty beyond a reasonable doubt. Specifically, he asserts that the testimony of the State's

witnesses was unconvincing, contrary to human experience and unworthy of belief. We disagree.

Allen was shot on August 2, 1975, and on December 19, 1976, about 16 months later, defendant was arrested. During this 16-month period, no complaint or arrest warrant was lodged against defendant. Defendant asserts that Allen's failure to direct the police to defendant, whom he had known for years, casts considerable doubt on his testimony.

However, Allen stated that he did not know defendant's last name. Allen could identify defendant only as "Dolphus" and did not know where he lived. Officer Watkins corroborated this testimony.

Furthermore, Allen and Townsend were both eyewitnesses whose testimony about the incident was consistent. Both identified defendant as the shooter. The credible identification testimony of one witness is sufficient to support a finding of guilt. *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601.

■■ Finally, defendant points out some inconsistencies in the State's case. In our view, these inconsistencies are minor in nature. Minor discrepancies affect the weight of the evidence, but do not affect the verdict. (See *People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229.) A court of review will not substitute its judgment for that of the trier of fact on questions of witness credibility. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 513.) Since there is evidence which, if believed, overwhelmingly supports a finding of guilt, we will not substitute our judgment for that of the jury.

Defendant's second contention is that he was denied his constitutional right to confront and cross-examine Allen, because he was prevented from asking questions as to his bias or prejudice toward defendant.

Allen, the victim, testified on cross-examination that in 1972 one of his brothers was murdered and an individual named Lou (Luella) Harris was charged with that crime. Allen didn't know what, if any, relationship defendant had with Lou Harris. He had never seen defendant in the company of Lou Harris. However, Allen testified that prior to his brother's death he had seen "Shine" and Myron Harris in defendant's company many times. Allen further testified that after his brother's death he had no feelings toward defendant. The State's objection to further questioning on the subject of Lou Harris' prosecution was sustained by the trial court. The court stated that since there had been no evidence adduced to connect the defendant in any way with the murder of Frank Allen's brother or with the alleged murderer, the asserted bias was too remote.

In an offer of proof, defense counsel stated that Allen would testify

that Lou Harris was acquitted. The defense hoped to show that Allen vowed revenge because his brother's murder was not vindicated in court. Even though he did not know what Allen would say, defense counsel maintained that defendant had a right to examine the witness for any bias he might have in order to verify defendant's claim that Allen and his friend had threatened him because of his friendship and association with the Harris family.

■■ The scope of cross-examination of witnesses in a criminal case is largely within the discretion of the trial judge and his decision will not be overturned unless there has been an abuse of discretion which has prejudiced the defendant. (*People v. Rolon* (1979), 71 Ill. App. 3d 746, 390 N.E.2d 107.) Although a criminal defendant has a constitutional right to confront and cross-examine witnesses (U.S. Const., amend. VI), this right "is not absolute and may in appropriate cases bow to accomodate other legitimate interests in the criminal trial process." (*Greenfield v. Robinson* (W.D. Va. 1976), 413 F. Supp. 1113, 1119.) Thus, even though the confrontation clause creates a "presumption in favor of free cross-examination," it remains "within the sound discretion of the trial court" to restrict the scope of cross-examination. (*United States v. Onori* (5th Cir. 1976), 535 F.2d 938, 945.) Consequently, nonrelevant evidence which would only confuse or mislead the jury may properly be excluded without violating defendant's right to confront witnesses. See *Greenfield v. Robinson.*

■■ ■ Generally, a witness' feelings of hostility or distrust toward defendant affect his credibility, are relevant areas of inquiry and, hence, are within the scope of cross-examination. (*People v. Henson* (1975), 32 Ill. App. 3d 717, 336 N.E.2d 264.) Defendant also cites authority for the proposition that the admissibility of impeachment as to bias, motive or prejudice is not dependent upon a preliminary showing by counsel that he can establish facts to discredit the witness. Cross-examination for the purpose of this type of impeachment is a matter of right. *People v. Coles* (1979), 74 Ill. 2d 393, 385 N.E.2d 694; *People v. Kellas* (1979), 72 Ill. App. 3d 445, 389 N.E.2d 1382.

In our view, the trial court did allow cross-examination as to the alleged bias and only restricted further questioning when it became apparent that no connection between Harris and defendant was established. At this point, further questioning as to bias was too remote and uncertain to be admissible. In *Dinschel v. United States Gypsum Co.* (1967), 83 Ill. App. 2d 466, 475, 228 N.E.2d 106, the court declared:

"* * * The trial court has the right to refuse evidence which will serve no useful purpose in the trial or which is incompetent to prove an issue. [Citations.]"

Relevant evidence "tends to prove a fact in controversy or renders a matter in issue more or less probable." *Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768.

Defense counsel was allowed to question Allen regarding his connection with the Harris family and his bias toward defendant. This questioning was only restricted when the asserted revenge motive was too remote, speculative and hence not relevant to the proceedings. Accordingly, the trial court did not abuse its discretion.

Defendant's third contention is that portions of the State's closing argument deprived him of a fair trial. He asserts that the State improperly called attention to the failure of the defense to call witnesses. Specifically, he complains of the following remarks:

> "A point to note that also during the course of the trial there was testimony some of the people who were there, including Clifford Patterson and you heard testimony during the course and some other gentlemen to, I think it was Terry, a friend who was also with the defendant in that Clifford Patterson, during the course of the trial, if you can remember, is in fact the defendant's cousin; * * *."

He asserts that subsequent arguments were also improper:

> "* * * Frank Allen testified he knew the names of three people that were standing on the porch that night. One of those persons was Earl Townsend whom you heard from the other person you heard from and speaking of bias or friendship between a victim and our witness, well, I would ask you to consider a bias between defendant, who is standing trial and a cousin of his.
>
> Defense counsel: Objection, Judge. His cousin didn't testify and bias and prejudice isn't in issue in this case.
>
> The Court: Thank you.
>
> Defense counsel: We have no knowledge it was his cousin.
>
> The Court: We sustain it."

Defendant asserts that the prosecutor's comments must have been intended to call attention to his failure to call Clifford Patterson, his cousin, to testify. We do not read these remarks as supplying this inference. In any event, we find the State's argument was proper under the circumstances of this case.

■■ Generally, "[i]t is improper for a prosecutor to comment on a defendant's failure to call a witness where the comment suggests that the witness would have testified unfavorably to the defendant and the witness is as accessible to the State as he would be to the defendant." (*People v. Gamboa* (1975), 30 Ill. App. 3d 242, 250, 332 N.E.2d 543.) However, it is not improper to make such comments if invited by and in retaliation to an

earlier argument to the jury by defense counsel. *People v. Johnson* (1968), 102 Ill. App. 2d 443, 243 N.E.2d 310.

We believe that defense counsel "opened the door" to counter-comment by the State on failure to call witnesses. These closing remarks preceded the State's comments:

"Defense counsel: * * * There were at least twelve people on that porch or wherever it was that knew me. My girlfriend lived up in that apartment in the same building with my daughter that I went to visit and Adolphus McElroy supposedly came out of that building.

Why couldn't that girl have been here to testify? Why couldn't she have come into this courtroom and said this is Adolphus McElroy. He was at my house to see our daughter.

Prosecutor: Objection. There is no evidence of that and the defense could have used a subpoena.

The Court: Sustained.

Defense counsel: I am sure I can argue it.

He was with his girlfriend, the mother of his child but yet he says that he left that apartment, came downstairs and on the porch was watching a dice game when he was shot. Well, she could have come in and corroborated that 100% that when he left that apartment he was in fine shape and when she saw him eleven days later she saw him with gunshot wounds or heard gunshots from her apartment.

Do you think that maybe of all the people that Frank Allen knew on the front of that porch that he says he knew and he said he admitted on the witness stand in spite of all the other lies he told, he admitted on the witness stand that he saw at least ten to fifteen people that he knew.

Prosecutor: Objection. That wasn't his—

The Court: Sustain the objection.

Defense counsel: He testified that there were between ten and fifteen people that he had seen from the time he got off of that bus to go into the neighborhood to play softball up until the time he was shot. Ten to fifteen people that he knew in that neighborhood and that he saw in that neighborhood and not one of those people but four are here are Earl Townsend who comes in here after two years, not one of those people comes into this courtroom and testifies, supposedly all his friends that he knew, people from the same exact neighborhood, possibly even from the same school who knew his brothers and all we have is Earl Townsend to say that Frank Allen said on the witness stand and what about Earl

Townsend? Here is Earl Townsend who comes in after two years and has the audacity to swear to tell the truth, get up on this witness stand and say that the first time he ever told anybody that it was this guy who did a shooting on August 2, 1975 was you people.

Prosecutor: Objection, Judge. He testified he was interviewed.

Defense counsel: He told Mr. Cutrone in the state's attorney's office but you are the first public group outside of Mr. Cutrone and Mr. Villalobos who heard what Earl Townsend had to say and what does he say: I said to him, 'Do you know Frank?' 'Yes. He is a friend of mine.' 'How often have you seen Frank Allen in the neighborhood since the shooting?' 'Everyday.' 'Do you know where the District station is in the area where you live?' 'Oh, sure.' 'Did you go to the District station and tell any policemen what you have just told these people?' * * *.''

Accordingly, we find no error.

■■ Defendant next asserts that the prosecution improperly bolstered the credibility of a State witness by suggesting to the jury that because he was subpoenaed his testimony was credible. The defense complains of the following comments by the State during closing argument:

"Prosecutor: * * * [L]ucky for us we did in fact have Mr. Earl Townsend and there is a stipulation here that he was brought in here by subpoena, that in fact the defendant asked him if he was asked if he would testify to be a witness and you heard him say on the stand, I asked if it was by Frank Allen and he said, no. He didn't want to come in but pursuant to that subpoena, whether or not, he did testify he did come in.

I am sure that you recognize why it is so difficult to get these people who live in that area, people who in fact were there. It is very difficult to get. We are lucky we got two witnesses to come in.
* * *

* * *

Ladies and gentlemen, you are all sitting here. You have all interrupted your lives to come here and sit on this jury and I don't suppose there is one of you people that came to the front door of this building and volunteered to be on jury service. You are here because you got a subpoena or a summons to appear as a juror, legal process, and you heard a stipulation, this is an agreement by the parties that evidence would show whatever the stipulation is, that is the reason that Earl Townsend came, because Frank Allen, when he knew the trial was coming up, to help him and said listen, you were there. You saw it. Would you come in and testify and what did he tell his friend, I mean counsel harped on how great a

friends they were, what did he tell his friend, he said, no. I am not going to come in and if we hadn't dragged him in here kicking and screaming pursuant to subpoena, he wouldn't have come.

Defense counsel: Objection.

The Court: Sustained. There is no evidence he was kicking and screaming.

Prosecutor: This is a case. We asked you to use your common sense but I have to suggest this to you too, you know you all are from various parts of the city. I don't think there is one of you that lives in a Housing Authority Project building and what goes on in your neighborhood might not be the same that goes on there. The amount of people that are shot and the amount of people that are killed in your neighborhood, I would suggest to you is not quite the same and you are living in a neighborhood where people perhaps do get involved but this is one where people don't. This is the case where nobody cared. * * *

* * *

Now, if Earl Townsend were going to lie, don't you think you would have heard him testify that he saw that first shot and he didn't, ladies and gentlemen. All he said was that he heard it but if he were going to lie, he wouldn't say that. * * *

* * *

You have to believe that he was just making that up to the police officer if you want to say that that man didn't shoot him *and you have to believe that Earl Townsend, who defense calls a liar was so willing to perpetrate this lie that we had to subpoena him to get him in.* * * *." (Emphasis supplied.)

Initially, we note that only the emphasized portion of the State's argument supports an inference that Townsend was a credible witness because he testified pursuant to subpoena. The balance of the excerpted argument mainly concerns Townsend's reluctance to testify and the State's suggested explanation for this behavior.

The State contends that since a timely objection at trial was not made, the issue is now waived. Even if not waived, we believe the State's remarks constitute legitimate inferences from the evidence and do not exceed the bounds of proper debate.

Earl Townsend testified that although he had witnessed the shooting, he never informed the police or any law enforcement agency. Townsend admitted that the victim, Frank Allen, was his friend. Yet, when Allen asked him to be a witness Townsend refused. The parties stipulated that Townsend testified after being subpoenaed.

In essence, the State contended that if Townsend intended to lie, he

would have voluntarily become a State's witness. We do not believe this is the only conceivable inference derived from the facts that Townsend refused to testify for defendant and was subpoenaed as a State's witness. Nor do we necessarily agree that it was the correct inference. Nonetheless, the stipulation of the parties indicates their belief that the fact that Townsend was subpoenaed was relevant to the proceedings. Accordingly, all legitimate inferences from the relevant evidence are proper subjects for argument. (*People v. Miller* (1958), 13 Ill. 2d 84, 148 N.E.2d 455, *cert. denied* (1958), 357 U.S. 943, 2 L. Ed. 2d 1556, 78 S. Ct. 1394.) Moreover, we believe that it was defense counsel's function to assert opposing inferences to the jury. The ultimate responsibility for determining how, if at all, a subpoena affected Townsend's credibility is vested in the trier of fact. We cannot say, as a matter of law, that Townsend's testimony pursuant to a subpoena coupled with his refusal to testify for his friend had no bearing upon his credibility.

Defendant's final contention is that he was entitled to a new sentencing hearing because the trial court believed he had been convicted of a felony when, in fact, he had been convicted of a misdemeanor. Defendant's presentence investigation report indicated, among other convictions, that he had previously been sentenced to six months' imprisonment for robbery in 1973. At the sentencing hearing, defense counsel argued in mitigation that defendant had never been convicted of a felony:

"The Court: I have read the pre-sentence.

Defense counsel: Okay, I would merely call the Court's attention to the fact that he has never been convicted of a felony before in his life, this is the first felony.

The Court: Robbery is a felony. I don't know how it came to six months.

Defense counsel: It's obvious the charges must have been reduced to theft. Petty theft, that is the only way the Defendant could have gotten six months."

In sentencing McElroy, the trial judge stated:

"I am certainly not going to give you probation, McElroy, after reading your pre-sentence report, hearing from both sides, and considering the facts of this case, which is a malicious shooting, it wasn't the type of situation that arises out of an argument, the person was shot once, it was a very vicious act that you committed not only shooting the individual one time, but then chasing him down the street and shooting him a second time.

Judging this and your prior background you are in great need of some rehabilitation that cannot be accomplished on probation. You have two prior convictions, short term, yes.

I will send you to the State penitentiary not less than three or more than nine years."

Defendant has supplemented the record on appeal with a certified copy of the original complaint charging defendant with robbery. (Ill. Rev. Stat. 1973, ch. 38, par. 18—1.) According to the half-sheet, also included in the supplemental record, the State *nolle prossed* the robbery charge. A new complaint, charging defendant with petty theft (Ill. Rev. Stat. 1973, ch. 38, par. 16—1(a)), was filed. Defendant pleaded guilty to this charge and was sentenced to six months' imprisonment.

We are of the opinion that the trial court was sufficiently apprised of the facts concerning this prior conviction. Any initial misapprehension by the court was alleviated by defense counsel's explanation that the robbery charge (felony) must have been reduced to petty theft (misdemeanor) in order to account for a six-month prison sentence. We fully trust that the trial court appreciated this distinction and knew that only a misdemeanor would net a six-month prison term. (Ill. Rev. Stat. 1977, ch. 38, par. 2—11.) Our view is supported by the trial judge's comment that defendant had two prior short-term convictions. Accordingly, we find no error or abuse of discretion in the sentence imposed by the trial court.

For the aforementioned reasons, defendant's conviction and sentence are affirmed.

Affirmed.

McGLOON and CAMPBELL, JJ., concur.