THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DIANE COLLINS, Appellant.

Second Department, December 21, 1981

**APPEARANCES OF COUNSEL**

*William E. Hellerstein (Susan Manca* of counsel), for appellant.

*Eugene Gold, District Attorney (Norman S. Heller* of counsel), for respondent.

**OPINION OF THE COURT**

WEINSTEIN, J.

This court is called upon to determine the extent to which the State constitutionally must undertake procedures for the purpose of safeguarding a criminal suspect from a mistaken aural identification.

At the time of the crime involved herein, Otti Cohen owned a furniture store in Brooklyn. She had a daughter Rebecca, who lived in Commack with her one son, and a son named Harry. Her other daughter, Ruby, lived nearby with an individual named Bobby Stephenson. Otti had met Stephenson and had spoken to him many times on the

telephone, and on four occasions when Stephenson visited Otti at her home. On one of those occasions, Otti expressed concern as to how Stephenson would support Ruby if they were to marry; Stephenson replied, "Don't worry about it, Mrs. Cohen. I will make a living for your daughter." Even so, Ruby and Stephenson often spoke to Otti regarding a gift of money for the purchase of a new car.

In September, 1976, Otti Cohen received a telephone call at her store. The caller said, "Hello". Otti immediately recognized the voice as that of Stephenson, and said, "Bobby"? The response was "yes". The caller continued, "Mrs. Cohen, I know your family. I know your daughter, in Commack. I know your grandson. I know Harry, your son Harry and I know your daughter and I want $3,000 from you and I will call you again." Otti Cohen was certain that the caller was Bobby Stephenson.

Otti received another telephone call the next day. This time, when she asked if the caller was Stephenson, the response was, "No, you have the wrong man." Nonetheless, Otti had no doubt that the caller was Stephenson. The caller then repeated the essence of the conversation of the previous day, but this time concluded: "Your daughter, Ruby and I must have the $3,000 by Friday. If not, something terrible will happen to your family."

Otti Cohen contacted the police, and a tape recorder was attached to the telephones at her home and the store. Three telephone calls, one from the man she believed to be Bobby Stephenson, and two from a female whose voice she did not recognize, and all with respect to the same extortion plan, were recorded during the next three days. Finally, a few days after the first threatening call, Otti Cohen rode in a taxicab driven by a detective to a location which had been agreed upon by her and the callers. The cab pulled over to the curb, and a woman approached the vehicle. The woman asked "Do you have the money?" Mrs. Cohen said "yes" and handed the woman an envelope containing $800. At this point, the detective who had been driving the cab placed the woman under arrest. The woman, whom Otti had never seen prior to that date, was appellant Diane Collins.

Ruby Cohen was summoned to the station house at which Collins was being detained, in order to listen to the tapes of the conversations recorded on her mother's telephone, and to determine whether she recognized the voices of the extortionists. No one gave her any hints as to the identity of the voices she was to hear. Ruby noticed Collins, whom she had met on some four or five previous occasions, seated at a desk in the station house, but she did not know that Collins was in custody. Indeed, Collins was not handcuffed. Ruby then listened to the first tape, started crying, and exclaimed, "That's Bobby." On a second tape, she identified the voice of Collins. She stated at trial that the fact that she noticed Collins in the station house before she listened to the tapes had nothing to do with her opinion that it was Collins' voice on the tape. It should be noted that Ruby Cohen had had ample prior opportunity to become familiar with Collin's voice, having sat next to her and conversed with her at a Golden Gloves tournament at the Felt Forum and having been with her and conversed with her during a car ride of several hours. She also knew that Collins had been dating Stephenson after she and Stephenson broke up. Subsequent to Ruby's aural identification of him, Bobby Stephenson was also placed under arrest.

Collins and Stephenson were tried jointly. The tapes of the telephone conversations with Otti Cohen were played for the jury at the trial, and Ruby Cohen testified that she had heard the tapes at the police station and had identified the voices on the tapes as those of the defendants. Both defendants were found guilty of attempted grand larceny in the first degree, and defendant Diane Collins now brings this appeal, challenging the admissibility of Ruby Cohen's aural identification.

The ground urged by appellant for reversal is that Ruby Cohen's aural identification of appellant, in appellant's presence, constituted an unnecessarily suggestive one-on-one showup, of the type that has been repeatedly found constitutionally impermissible (see *Stovall v Denno,* 388 US 293; *People v Ballott,* 20 NY2d 600; cf. *People v Blake,* 35 NY2d 331). Although no appellate court of this State has delineated the degree to which constitutional safe-

guards must be applied in the case of an aural identification (cf. *People v Allweiss,* 48 NY2d 40, 49),[1] several Federal appellate courts have dealt with the issue. The bottom line of those cases (see *infra*) is that as long as the out-of-court aural identification process is not unduly suggestive, so that, under the totality of the circumstances, there would be a significant likelihood of irreparable misidentification, then testimony regarding the out-of-court aural identification, or an actual in-court aural identification based thereon,[2] is admissible at trial (cf. *Manson v Brathwaite,* 432 US 98; *Neil v Biggers,* 409 US 188).

We begin by noting that the Federal Constitution does not require that counsel be present when an aural identification of a suspect is made, as it does when, in the absence of special circumstances, a visual identification is made during a critical stage of the proceedings (see *United States v Wade,* 388 US 218; *Stovall v Denno,* 388 US 293, *supra*). The United States Supreme Court, in *United States v Ash* (413 US 300, 317), held that when a suspect is not physically present at a pretrial identification procedure (in *Ash,* a photographic identification procedure was involved), counsel is not required, because "no possibility arises that the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary." Therefore, although certain tribunals in other States have held that counsel is indeed required to be present when an out-of-court aural identification is made (see *State v Wright,* 274 NC 84, 90, cert den 396 US 934; *People v Thomas,* 44 Mich App 649, 656), we decline to so hold, and reiterate that it is sufficient if, in light of the totality of the

1. One trial court has held that a defendant moving to suppress an out-of-court aural identification is entitled to a hearing on the motion (see *People v Singleton,* 83 Misc 2d 112; CPL 710.20, subd 5). However, since Collins did not make such a pretrial motion, we need not determine whether she was entitled to a hearing. In any event, a *voir dire* on this issue was held at trial.

2. We note that although Ruby Cohen testified that she had heard the tape with Collins' voice, and had identified Collins' voice prior to the trial, (1) she never identified Collins at the trial itself, and (2) there was no independent testimony that the speaker on the tape was indeed Collins. If the out-of-court identification had been visual, then, under these facts, Ruby's testimony regarding her out-of-court identification would have been inadmissible pursuant to, respectively, CPL 60.30 and CPL 60.25. However, in view of Collins' failure to raise this point, we decline to determine whether the aforementioned sections of the CPL are applicable to aural identifications and, if so, whether reversal would be required on this ground.

circumstances, there is no significant likelihood of mis-identification inherent in the identification procedure.

An examination of several cases decided by Federal appellate courts supports this conclusion. In *Palmer v Peyton* (359 F2d 199), a rape victim was told that the police had arrested a suspect, and was asked to come to the police station to see if she could identify his voice. She was asked to listen to no voice other than that of Palmer, the suspect, even though another man had been a suspect until hours earlier and had cleared himself only by accusing Palmer. Palmer spoke, during the identification procedure, with nothing over his head, even though at all times during the rape, the attacker wore a snugly-fitting paper bag, which presumably muffled his voice, over his head. During the identification procedure, an orange shirt, similar to the shirt worn by the rapist, was shown to the victim. The victim was not allowed to see Palmer, even though he was physically present and a visual identification might have added reliability to the procedure. In view of the clear possibility of misidentification, the court found a violation of due process, and vacated Palmer's conviction.

In *Crume v Beto* (383 F2d 36), on the other hand, the court refused to vacate a conviction based upon an aural identification procedure wherein the complaining witness heard only the voice of the defendant during a one-on-one showup. The court noted that the witness had first picked the defendant out of a lineup, and only then asked to hear his voice, in order to assure herself that she had the right man. Satisfied that the identification procedure was not unduly suggestive, the court refused to set the conviction aside.

*United States v Pheaster* (544 F2d 353, 369-371) is re-markably similar to the case at bar. A police officer who was acquainted with the defendant was asked to listen to a tape recording of his voice. He was told in advance whose voice he was going to hear (note that in the case at bar, Ruby Cohen was not so apprised), and then indeed identi-fied the defendant as the speaker. Even though no other tapes were played and no names but the defendant's were mentioned, the court held that the procedure, while sug-gestive, was not *unnecessarily* suggestive, in light of the

officer's acquaintance with defendant. Other Federal appellate cases in which previous familiarity, on the part of the identifier, with the voice he identified was held to add reliability to the identification are *United States v Smith* (467 F2d 1126, 1131), *United States v Moore* (571 F2d 76, 91), and *United States v Albergo* (539 F2d 860).

Essentially, then, an aural identification must be surrounded by the same procedural safeguards as a visual identification made prior to a critical stage of the proceedings. It makes no difference whether, for instance, the identification is made by a victim or witness of a crime to whom the suspect is a stranger or, as here, the identification is made by an acquaintance of the suspect who had nothing to do with the crime. In either case, if, under the totality of the circumstances, there is no significant likelihood of an irreparable misidentification, an aural identification of the defendant will be admissible at trial.

We may now apply this rule of law to the facts before us. Collins places great significance on the fact that Ruby Cohen viewed her in the station house shortly before hearing the tape recording. She asks this court to suppress the aural identification, for all intents and purposes, on that basis alone. We decline to do so. Before hearing the tape, Ruby was given absolutely no indication as to the identity of the voice she would be hearing. Certainly, a mere viewing of an unhandcuffed individual, without awareness that she was in custody, is less suggestive than being told in advance the identity of the voice to be heard, and yet, under the latter set of facts, the court in *United States v Pheaster* (544 F2d 353, *supra)* held the identification admissible. In any event, Ruby stated under oath that her opinion that it was Collins' voice on the tape was unaffected by the fact that she saw Collins just before she heard the tape. We cannot say that this viewing of Collins by Ruby rendered the subsequent aural identification unduly suggestive. This evidence was properly submitted to the jury for an assessment of its weight.

Another consideration, based on State law, buttresses our conclusion. CPL article 710 sets forth the steps that the prosecution must take before it is permitted to introduce at trial, *inter alia,* evidence identifying a defendant as the

person who committed an offense. The Court of Appeals, in *People v Gissendanner* (48 NY2d 543), stated that the purpose of this procedure was to assure a defendant an opportunity to challenge a pretrial identification obtained in a suggestive manner. Therefore, as a corollary to this fact, in cases "in which the protagonists are known to one another, 'suggestiveness' is not a concern and, hence, the statute does not come into play" *(People v Gissendanner, supra,* p 552). In that case, the court held that the failure of the prosecution to notify the defendant that two police officers who had seen her on the day of the crime would identify her at trial did not preclude the prosecution from introducing the identification evidence at trial.

We recognize that the *Gissendanner* decision dealt only with the notice requirements of CPL article 710. It certainly does not mean that an identification by an individual of an acquaintance can never be deemed suggestive. The danger of mistaken identification is indeed far greater when one hears only a voice as opposed to seeing an entire body. But when, as here, the identifying witness and the suspect to be identified are well known to each other, that fact is to be given great weight in determining the likelihood of misidentification arising from the identification procedure.

We hold that any likelihood of misidentification here was far too inconsequential to rise to constitutional proportions. Accordingly, the judgment of conviction should be affirmed.

HOPKINS, J. P., TITONE and RABIN, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered August 8, 1978, affirmed.