OPINION OF THE COURT
Albert M. Rosenblatt, J.
The defendant stands indicted for the murder of Green Haven Correction Officer Donna Payant. The indictment is drawn pursuant to section 125.27 (subd 1, par [a], cl [iii]) of the Penal Law charging what is a capital offense (Penal Law, § 60.06) for allegedly committing murder while in custody upon a life sentence.[1]
The defense has moved to suppress the defendant’s statements after receiving notice of the prosecutor’s intention to introduce them (CPL 710.30). They also challenge the admissibility of the proposed testimony of a number of prosecution witnesses, claiming that the witnesses, who were hypnotized, are thereby rendered incompetent to testify.
As for the defendant’s statements, the court held a Huntley hearing (People v Huntley, 15 NY2d 72, 75; CPL 710.60, subd 4) which has centered around the interplay of the Fifth and Sixth Amendments, the Miranda case, and the custodial state of an alleged suspect already imprisoned on unrelated charges — or, as it might be termed, the question of custody within custody. A hearing was also held on the hypnosis motion.
*739 The court makes the following findings of fact and conclusions of law.
The body of Green Haven Correction Officer Donna Payant was discovered, extensively bitten and mutilated, on May 16, 1981, at a garbage landfill in Amenia, New York, at which Green Haven refuse deposits are made. The New York State Police immediately became involved in an investigation to determine who killed her.
At the time Payant was killed, Lemuel Smith was an inmate at Green Haven Correctional Facility, assigned to work in the office of the Catholic Chaplain, Father Edward Donovan — the location at which the People claim Donna Payant met her death.
At the outset, and through the five-day period from the discovery of the body on May 16, 1981, until the first interview with defendant on May 21, 1981, many people were interviewed by the police in an attempt to track the victim’s movements and whereabouts on May 15,1981, the date of the killing.
The defendant was first interviewed on May 21,1981, at about 2:40 p.m. by Senior Investigator John Crodelle, in the presence of two other New York State Police investigators. The People concede that he was questioned without having first been warned under Miranda v Arizona (384 US 436), but contend that no warnings were necessary because the defendant was not “in the custody” of the State Police, and endeavor to distinguish between police custody for Miranda purposes, and general prison population confinement. Under some circumstances, the difference may be controlling, because the Fifth and Sixth Amendments should not be read in a wholly abstract vacuum, unrelated to the realities of a homicide investigation conducted in a prison. If confinement alone were the test, no prisoner, because of his status as an incarcerated felon, could ever be lawfully questioned without Miranda warnings (Cervantes v Walker, 589 F2d 424, 427).
No decision has reached that far, and the parties, recognizing it, have focused their proof on the defendant’s individual status, and the issue of whether he was one who, by virtue of the direction taken in the investigation, was a *740 custodial suspect to whom Miranda warnings would have been mandated. Thus, the defendant’s status was argued for Huntley purposes, insofar as it affects defendant’s classification under New York cases which define custody for Miranda requirements (e.g., People v Rodney P., 21 NY2d 1; People v Kwok T., 43 NY2d 213). The People adduced proof to show that on May 21, 1981, the defendant was in the undifferentiated prison population, and that he was not moved to the Special Housing Unit until May 25, 1981, when the State, on that date, acquired a court order (Town of Beekman Justice Robert Ferriss) authorizing the seizure of the defendant’s false teeth, to compare them with the bite marks on Donna Payant’s body.
The prosecution contends that until May 25, 1981 he was, at least on the surface, treated no differently, in terms of his housing and meals, than any other prisoner. The proof is fairly susceptible of this interpretation. There is also Exhibit H, a prison memo, which suggests the opposite, but which, because of the ambiguity surrounding it, cannot be given controlling or even contributory weight.
It is also clear that on May 21, 1981, at the time of the first Crodelle interview, there were several inmates whom the police were looking at, and had not yet fixed all of their attention on any single person. Indeed, the court finds that on May 21,1981, Captain DeFrancesco asked the prison for a list of Green Haven murderers and sex criminals, which he received, and then on May 22, 1981, asked for a second list of Green Haven prisoners with records of sex homicides or serious sex crimes.
The lists numbered over 600, a figure which lends support to the prosecution’s claim that with so large a pool of possible suspects, the State’s undivided gaze had not come to rest on any single one of them. It does not, however, rule out the existence of three or four prominent suspects. The defense, on the other hand, claims, and the court finds, that when the defendant was questioned on May 21, 1981, the New York State Police were aware that the defendant had been accused of the July 21, 1977 bite-mark murder of Marilee Wilson, in Schenectady, New York. The similarity and modus operandi involved in the two crimes could not possibly have escaped them, and they do not claim other *741 wise. It certainly had not escaped the Albany news media, or the Albany television evening newscast of May 21,1981, in which defendant’s name was mentioned in connection with the Payant case, prompting his appellate attorney, Anthony Adang, to telephone the prison the following day concerning the questioning of the defendant.
The court further finds that two days before the May 21, 1981 interview, the New York State Police spoke with Albany and Schenectady law enforcement officials concerning the defendant and the Marilee Wilson case, and asked for photographs of Marilee Wilson’s body, and received them before the May 21, 1981 Crodelle interview. Moreover, the police knew that defendant worked in the office in which Donna Payant was. believed to have been killed, and that the defendant’s duties, among others, included transporting refuse bags for their eventual delivery to the Amenia landfill.
Defendant also claims that apart from the failure to warn him while he was allegedly in custody, he could not be lawfully questioned in the absence of the attorney then handling defendant’s 1977 rape conviction,[2] and that the cases of People v Hobson (39 NY2d 479) and People v Rogers (48 NY2d 167), together create a Sixth Amendment right to counsel, nonwaivable in the absence of counsel (see People v Johnson, 89 AD2d 812).
While the Hobson court limited its holding to custodial questioning and expressly held that the right is not operative when the defendant is represented by counsel in a proceeding unrelated to the charges under investigation (supra, p 483; People v Hetherington, 27 NY2d 242, 245), subsequent decisions have extinguished those limitations and have extended both facets of the rule. Defendant argues, therefore, that even if he was not “in police custody” during the May 21, 1981 Crodelle interview, the Sixth Amendment prohibition would attach, and with it the Hobson extension (People v Rogers, 48 NY2d 167, supra), if it be found that while at Green Haven on May 21, 1981, the defendant had an attorney in an active but *742 unrelated appellate case. This formulation is close to, but goes somewhat beyond, the one which the Appellate Division, Fourth Department, thought impossible and illogical, when rejecting it in People v Smith (79 AD2d 210) — a decision reversed by the Court of Appeals (54 NY2d 954).
Indeed, the Sixth Amendment has been ruled to attach when counsel actually interposes himself in a case under investigation, even though the defendant is not in custody (People v Skinner, 52 NY2d 24; People v Ellis, 58 NY2d 748), or when a defendant, though not in custody, has expressed a desire for an attorney (People v Johnson, 79 AD2d 201).
None of the above-cited cases are by themselves controlling, because none have gone so far as to hold that a noncustodial defendant who has an attorney in an unrelated pending appeal may not be questioned absent a waiver in the presence of counsel. Indeed, one court has flatly refused to go that far (People v Hauswirth, 89 AD2d 357, 360), asserting that to do so would be to grant “a special privilege to those who have had repeated contacts with the law”.[3]
We therefore examine the issue of custodial interrogation, which is pivotal. Tallying up, we find: (a) When defendant was questioned on May 21, 1981, the police kne w or believed that Donna Payant was bitten and mutilated, and the police had information that the defendant had, in the past, committed a similar crime or crimes; (b) She was killed in the very office to which the defendant had been assigned to work; (c) She was found in a refuse landfill, and it was defendant’s job to cart refuse bags from the very office in which he worked and in which Donna *743 Payant was killed, and (d) That an inmate named “Smitty” was seen carting garbage bags from the area.
There was an abundant cause for suspicion. No person in the defendant’s shoes, be he guilty or innocent, could reasonably perceive otherwise (People v Grant, 80 AD2d 862, app dsmd 56 NY2d 611).
The subjective and uncommunicated views of interrogators are not controlling, yet anyone questioned under those circumstances would reasonably conclude that he was being questioned as far more than a mere witness. The defendant could have been disabused of that perception only if the police told him what they are now telling the court: that he was not in their custody, and that he was not their suspect (cf. People v Biggs, 88 AD2d 960). At this stage, the assertion lacks the genuineness that it would have had were it expressed at a far more relevant hour.
Givén a setting which, by its very nature represents the antithesis of freedom and mobility, combined with the gravity and intensity of the investigation, and the institutionally adversarial relationships, the police chose not to inform the defendant that he was free to leave the room, or that he was not circumscribed, either figuratively or literally. Had they told him so, they would have not only been clarifying the defendant’s status, but might very well have fashioned it, so as to freely question a “noncustodial” subject, without Miranda warnings.
In border-crossing stops this type of notification is controlling in determining whether a person is without or within the custodial state (compare United States v Estrada-Lucas, 651 F2d 1261, with United States v Luther, 521 F2d 408).
In a prison setting, however, the “free-to-leave” test must be modified, because prisoners are never free to leave. A pure custody test would mean that no prisoner could ever be questioned without Miranda compliance — a wholly unworkable and disruptive approach (Cervantes v Walker, 589 F2d 424, 427, supra). There must, therefore, be some additional circumstance, condition, or limitation imposed on an imprisoned suspect’s status or mobility before Miranda applies.
*744 Clearly, one’s incarceration in a prison setting does not eviscerate Fifth or Sixth Amendment rights (Gabrilowitz v Newman, 582 F2d 100, 105, n 4). There are distinctions, however, in the application of those amendments to prison disciplinary proceedings, as opposed to investigations for future criminal prosecution.[4] (As to the former, see Wolff v McDonnell, 418 US 539; Baxter v Palmigiano, 425 US 308.)
Both involve a “ ‘reasonable accommodation between the interests of the inmates and the needs of the institution’ ” (Baxter v Palmigiano, 425 US, supra, at p 324), but there is nothing in Miranda or its progeny which suggests that its protections be denied to prisoners who are under threat of future criminal court prosecution.
No New York case has been presented dealing with the custody-within-custody condition, but the Supreme Court specifically rejected an invitation to limit Miranda to the questioning of “one who is ‘in custody’ in connection with the very case under investigation”, holding that Miranda applies to a prisoner under custodial investigation in connection with a possible future prosecution for another crime (Mathis v United States, 391 US 1, 4; see, also, Jett v Castaneda, 578 F2d 842; United States v Reid, 437 F2d 1166; Blyden v Hogan, 320 F Supp 513, 518).
Because it was taken without legal compliance, the defendant’s statement of May 21, 1981 — scant, exculpatory, and voluntary though it was — may not be used on the prosecution’s case-in-chief[5] (as distinguished from its *745 use in other parts of the trial [see People v Wise, 46 NY2d 321; Harris v New York, 401 US 222]).
The second challenged statement grew out of a conversation between defendant and Correction Officer Robert F. Zeller, on the morning of May 22,1981. The defendant was drawn into the conversation by Zeller, who undeniably initiated it, and who duly reported it to the police. It was not, therefore, a spontaneous “blurt out” of the type which qualifies for the exception (People v Lucas, 53 NY2d 678).
While the conversation was by no means characterized by blatant or coercive interrogative techniques, the court is unable to conclude, that Zeller was unaware of the defendant’s status, or that the exchange — instigated by Zeller and conducted while visiting defendant’s cell for no ostensible purpose, and while delivering packages but having none for the defendant — was “not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed” (People v Maerling, 46 NY2d 289, 302-303). The burden of proof as to this is on the People (People v Stoesser, 53 NY2d 648) and they have not carried it.
The next event of importance occurred at 12:45 p.m. on May 22, 1981, when Anthony Adang, a Saratoga County attorney, telephoned Green Haven and asked to be connected with the defendant. His action was prompted by an Albany television newscast of the evening before, in which the reporter, in broadcasting news of the Payant homicide, mentioned the name of the defendant, for whom Adang was then handling the 81 AD2d 1046 appeal.
Adang was put through to Carol Ann Larson, a dicta-phone transcriber, and it is undisputed that he asked to speak with the defendant, saying that he was defendant’s appellate attorney. Miss Larson told him that it was not possible for him to speak to defendant because the prisoners were all locked in, as an aftermath of the Payant homicide.
What follows is in dispute, with Adang claiming that he told Larson that no one was to question the defendant without Adang or any other attorney present. Larson, on *746 the other hand, testified that Adang said that he wanted the defendant notified not to speak with anyone until the defendant spoke to an attorney.
The People argue that the distinction is important, and that it marks the difference between the intervention of counsel for Sixth Amendment purposes, and a gratuitous bit of advice from someone who had no standing to give it.
The court is satisfied that under New York decisional law, the difference is of no (State) constitutional significance and would only involve hair splitting. It is enough to conclude that the authorities were plainly put on notice as to the existence of Mr. Adang and his legal relationship with defendant. There is little doubt under New York law that from the moment A.dang telephoned and was denied access to the defendant, no further questioning was permissible, with or without warnings, absent a waiver in the presence of counsel (People v Ramos, 40 NY2d 610; People v Pinzon, 44 NY2d 458; see, also, State v Matthews, 408 So 2d 1274 [La]).
The failure of the authorities[6] to deliver the message to the defendant makes things worse yet (cf. People v Smith, 93 Ill 2d 179), and stands in sharp contrast to the monumental lengths to which the officials went in procuring the presence of Father Edward Donovan, the Catholic Chaplain under whose auspices the defendant, on May 26,1981, made what the People contend to be a spontaneous, volunteered statement — which the court will discuss further on.
The third statement under review is the second Crodelle interview conducted on May 23, 1981, in the presence of Lieutenant Nealon. Again, the People concede, and the court finds, that no Miranda warnings were given. While the defendant did not request an attorney, he halted the *747 conversation after a brief time, stating that this was an “electric chair” case and that he wished to discuss it no further.
The content of the interview, before it was stopped by the defendant, suffers from the same infirmity as the first Crodelle interview and hence is barred from use on the People’s case-in-chief, but with no preclusion intended for possible use under Harris (supra), and Wise (supra).
On May 25,1981, after the police had executed the Town of Beekman seizure warrant for defendant’s teeth, and read the defendant his Miranda rights for the first time, defendant expressly asked for an attorney. The State Police told prison authorities to do whatever they normally do when such requests are made. In fact, the defendant did not see an attorney until his arraignment on June 6,1981. He was, however, permitted to make a telephone call on the evening of May 25, 1981, at about 8:05 p.m.
The People assert that the Sixth Amendment did not come into play until that moment (Edwards v Arizona, 451 US 477), and concede that regardless of defendant’s custodial state, no statement could thereafter be taken without a Miranda waiver in the presence of counsel (People v Johnson, 79 AD2d 201, supra), unless the statement was volunteered, within the meaning of Maerling (supra), Lucas (supra), and kindred cases.
The defendant, shortly after the seizure warrant was executed, told Green Haven Lieutenant Strack that he wanted to meet with Father Donovan. This request was communicated to the New York State Police, who employed herculean efforts to locate and retrieve Father Donovan, who, on May 25, 1981, was attending a professional program at Ft. Monmouth, New Jersey. Father Donovan testified that he received a series of urgent calls from the police, and that elaborate arrangements were made for his return by State Police helicopter, for the private counseling session requested by defendant.
Father Donovan arrived back at the prison on the morning of May 26,1981, and was immediately ushered in to see the defendant, privately. The court finds that the chaplain was not told to extract any information from the defendant. Father Donovan’s motivations were religious and thor *748 oughly genuine. He did not see himself as a vehicle for the acquisition of incriminating information otherwise barred by law.
Father Donovan visited with the defendant, in private. After their confidential session ended, Lieutenant Strack was invited in on the conversation. Father Donovan then told Strack that there was a “security problem” that the facility should be aware of, and told the defendant to repeat to Strack what defendant had just told Father Donovan. The defendant then gave an exculpatory account to Strack, centering on some innocuous dealings that he recently had with Donna Payant.
Strack then urged the defendant to repeat the account to New York State Police Investigator Zappolo, who was poised and present to hear it, after giving the defendant his Miranda rights.
At this point the defendant balked, but Strack prevailed on him to repeat the narrative; that he might just as well do so because he, Strack, would inform the police anyway. At that the defendant repeated the account to Investigator Zappolo.
The repetition to Zappolo must be recognized as anything but volunteered. The defendant’s initial statement, given to Strack at Father Donovan’s behest, fares no better.
After the prison authorities sealed off the defendant from attorney Adang, and having presumptively failed to deliver what at the very least was a cautionary message from Adang, the authorities set the scene for what the People now claim to be a spontaneous declaration. Father Donovan was not a covert police agent (cf. Leyra v Denno, 347 US 556), but his presence and involvement, which produced the challenged statement, were certainly not the result of any overwhelming official concern for the defendant’s spiritual state. It was expediently arranged with the hope that something beneficial to the investigation might come of it, and was not a “blurt out” statement, but was an *749 extension of police activity (People v Grimaldi, 52 NY2d 611).
By concluding that the statements were improperly induced, within the meaning of Maerling (supra), et al., the court does not reach the question of privileged communication, which was invoked by Father Donovan at the Huntley hearing. The court informed Father Donovan that neither the prosecution nor the court sought to penetrate the privilege by inquiring into the contents of the wholly private conversation between the defendant and Father Donovan, but expressed doubts as to its application once the conversation was expanded, at defendant’s behest, to include at least Strack and Zappolo (CPLR 4505; Baumann v Steingester, 213 NY 328).[7]
For purposes of this hearing, the court holds that the statements to Strack and Zappolo do not fit within the narrow exception carved out for spontaneity, and are therefore inadmissible on the prosecution’s case-in-chief. The court does not, by its holding, rule or infer that the assailed conversations are within the privilege so as to preclude their use at the trial in reliance on Harris (supra) or Wise (supra).
The remaining interviews conducted on May 27, 1981 and May 28, 1981, were initiated and conducted by the police long after the request for counsel was made on May 25, 1981, and after Anthony Adang was denied access to defendant on May 22, 1981, and were not at all spontaneous and, for these reasons, cannot be introduced on the prosecution’s direct case.
After arraignment on June 6,1981, the defendant, in the presence of Investigator Valentino of the New York State Police, asked, “Am I the only one arrested for this?” or words to that effect. The statement, concededly spontaneous (People v Rivers, 56 NY2d 476) is admissible.
*750 THE HYPNOSIS MOTION
A hearing was conducted on the proposed admissibility of testimony at the trial of witnesses who underwent hypnosis.
While there is no statutory procedure for the adjudication of these issues, we have fashioned one, following the disclosure by the prosecutor, that he intends to call witnesses who have undergone hypnosis.
DISCLOSURE
The court envisages a duty on the part of the prosecutor to notify the defense that he intends to call witnesses who have undergone hypnosis in connection with the facts of the case. While no specific timetable is contemplated, it should be disclosed sufficiently before trial so as to enable the defense to make challenge and preparation. Indeed, the failure to disclose the use of hypnosis could lead to preclusion (United States v Miller, 411 F2d 825, 830-831; Emmett v Ricketts, 397 F Supp 1025; see, also, People v Tait, 99 Mich App 19; Lawson v State, 280 NW2d 400 [Iowa]). The prosecutor has fulfilled that duty.
The court makes the following factual findings and legal conclusions:
Within less than two weeks after the homicide the police began a series of hypnotic sessions with a number of Green Haven inmates and correction officers. The purpose was to try to enhance the memories of witnesses who, as possible links in a chain of circumstantial evidence, could add something to the investigation. The hypnotist attempted to hypnotize 10 witnesses in all. Of these, the prosecution intends to call six. One witness, Correction Officer Claude King, apparently did not attain a state of hypnotic induction.
In all instances the sessions were conducted at Green Haven by former New York State Police Investigator Joseph Czaplicki with one or two other investigators in the room, generally out of the subject’s line of vision. The proposed testimony of all of the witnesses, to wit: Bruce Banker, Alfredo Diaz, Martin Rahilly, Jr., Bobbi Jo Waring, Joseph Bourgal, and Barbara Hinson, relates generally to the movements of the defendant and the victim in *751 and about the hospital corridor and the chaplains’ areas on the day in question. No witness claims to have seen the actual crime.
The policé had some prehypnotic factual rendition in the form of a statement or transcript, from each witness/subject. In some instances, an additional recitation was made, to Czaplicki, immediately before induction. The sessions were audio-taped in all cases, and the tapes have been received in evidence, except for a one-half hour portion of the tape of Barbara Hinson, which, the court finds, was inadvertently erased when Czaplicki pressed the wrong button during a replay.
The defendant initially moved to suppress the testimony of all proposed witnesses on the ground that People v Hughes (88 AD2d 17) renders their testimony incompetent.
Initially, after hearing the testimony of Correction Officer Bruce Banker and Correction Officer Bobbi Jo Waring, the defense, noting no meaningful differences between their prehypnotic, hypnotic, and posthypnotic narratives, apparently withdrew the motion to suppress, as to those witnesses. Thereafter, the defense, with no prejudice, clarified its position, claiming that while they could identify no pertinent differences, they were still seeking what amounted to complete disqualification of any hypnotized witnesses — a posture rather beyond Hughes. In Hughes (88 AD2d, supra, at p 22), the Appellate Division, Fourth Department, while holding hypnoticálly enhanced recollection inadmissible, expressly declined to impose any bar on the witness’ competency “to testify to facts which she was able to recall prior to undergoing hypnosis”.
The defendant therefore proposes that the court should disqualify entirely any witness who has undergone hypnosis, regardless of whether it is possible to isolate the witness’ prehypnotic statement from what followed.
Secondly, the defense contends that even if Hughes (supra) were applied, the hypnotic procedures employed were inadequate to protect against implantation and suggestion, and that the memories of the witnesses have been irreparably tainted by the hypnotic process.
*752 I
Hypnosis has had a chequered history, passing through various phases of mysticism, through the 18th century Franz Anton Mesmer era, whose name gave rise to a word associated with a trance-like state. By the early 19th century it began to gain scientific respectability through the research and writings of Jean Martin Charcot (1825-1893) and then Freud.
The term hypnosis was coined by England’s James Braid[8] and as one researcher wryly notes, “[T]here are as many definitions of hypnosis as there are definers” (Kroger, Clinical and Experimental Hypnosis [2d ed, 1977], p 26; see, also, Admissibility of Hypnotically Induced Recollection, 70 Ky LJ 187).
Freud saw hypnosis as having valuable uses in uncovering repressed or traumatic memories, with a potentially cathartic release accompanied by the alleviation of symptoms which inhibited normal function (Breuer and Freud, Studies in Hysteria, p 14, trans A. A. Brill, Monograph Series). It is this process of regenerating the memory which has held widespread appeal among law enforcement officials in investigating crime (Katz, Down Memory Lane, Hypnosis Helps Witnesses to Overcome Retrograde Amnesia, Law Enforcement Communications’30 [Aug., 1979]; Ault, Hypnosis: F.B.I.’s Team Approach, F.B.I. Law Enforcement Bulletin [Jan., 1980], p 5; Beasley, Forensic Hypnosis, Ident News 3 [Nov., 1981]). As a result, well over a score of cases, in numerous jurisdictions have involved judicial determinations on the subject of hypnotically enhanced memory. From the outset, the subject has captured the interest of legal commentators (Ladd, Legal Aspects of Hypnotism, 11 Yale LJ 173; People v Ebanks, 117 Cal 652).
The cases are diverse and somewhat discordánt, but have many points of similarity and reconciliation. By and *753 large, the cases have fallen into two lines, one in which the courts have allowed such testimony to be presented to triers of fact, and the other, which has not. There is also a middle course taken by some jurisdictions, in which hypnotically refreshed witnesses are found competent to testify if certain procedures or safeguards have been satisfied. Other courts have measured the practice against Frye for the “general acceptance test” (Frye v United States, 293 F 1013), or their own jurisdiction’s version of it.
There is a common thread which runs through all the cases. It reflects the concern of Judges who must determine whether the use of hypnosis arguably serves the truth by reviving hazy or blocked memories on the one hand, or whether the process manufactures pseudo-memory or otherwise obscures or commingles real memory with fantasy or confabulation. The cases which, understandably, are given the most exacting scrutiny and which, not surprisingly, have sometimes led to judicial exclusion to one degree or another, are those in which the witness either observed or endured an unspeakably monstrous experience, the horror of which has created what in lay terms might be called a mental block. When the investigators seek to “unlock” the memory and disgorge the underlying trauma by conducting or arranging for hypnosis to provide the critical or sole evidence against the assailant, the courts have had to determine whether the process aided or impeded the search for truth. When, however, the testimony was either unremarkable or involved no meaningful enhancement, the courts expressed proportionately less worry.
It should be noted here that neither party is seeking to introduce the contents of the actual hypnotic interviews for any purpose.[9] Clearly, such hearsay offers would be prohibited by the rules of evidence, at least for the purpose of proving their truth (People v Blair, 25 Cal 3d 640; Shockey v State, 338 So 2d 33, cert den 345 So 2d 427 [Fla]; *754 Rodriguez v State, 327 So 2d 903 [Fla]; Strong v State,_ Ind_, 435 NE2d 969; Greenfield v Robinson, 413 F Supp 1113; People v Ebanks, 117 Cal 652, supra; State v Harris, 241 Ore 224; Jones v State, 542 P2d 1316 [Okla]; People v Hangsleben, 86 Mich App 718; State v Pierce, 263 SC 23; State v Pusch, 77 ND 860); and in some instances, as a basis for expert opinion (Commonwealth v Langley, 468 Pa 392; but see People v Kester, 78 Ill App 3d 902; People v Modesto, 59 Cal 2d 722).
The literature makes the same distinction, as between testimony by a witness whose memory has been aided by hypnosis, and hearsay testimony of statements made while under hypnotic induction (Packer, Use of Hypnotic Techniques in Evaluation of Criminal Defendants, 7J of Psychiatry and Law [Fall, 1981]).
II
THE MAJORITY RULE
The vast majority of jurisdictions has declared that hypnotically induced testimonial recall generally poses no barrier to admissibility, but goes rather to its weight. This formulation has been adopted in Federal courts (United States v Adams, 581 F2d 193, cert den 439 US 1006; United States v Awkard, 597 F2d 667, cert den 444 US 885; Wyller v Fairchild Hiller Corp., 503 F2d 506; Kline v Ford Motor Co., 523 F2d 1067; United States v Narciso, 446 F Supp 252), with no Federal jurisdiction reportedly imposing any ban on admissibility (see Hypnotically Adduced Evidence, Ann., 50 ALR3d 602).
Among the States, the same approach has been taken in Indiana (Pearson v State,_Ind_, 441 NE2d 468; Strong v State,_Ind_, 435 NE2d 969, supra); New Mexico (State v Beachum, 97 NM 682); Georgia (Collier v State, 244 Ga 553; Creamer v State, 232 Ga 136); North Carolina (State v McQueen, 295 NC 96); Oregon (State v Jorgensen, 8 Ore App 1); Wyoming (Chapman v State, 638 P2d 1280); Florida (Clark v State, 379 So 2d 372); Missouri (State v Greer, 609 SW2d 423); and Illinois (People v Smrekar, 68 Ill App 3d 379). (See, also, Austin v Barker, 90 App Div 351, 110 App Div 510.)
*755 These cases vary in degree, but in several of them, the courts allowed the testimony to come in even though the witness or victim, with dramatically renewed recall, described a violent act by the defendant and incriminated him in the extreme (e.g., State v McQueen, supra; Pearson v Indiana, supra; Clark v State, supra; State v Greer, supra; People v Smrekar, supra; State v Jorgensen, supra). These cases stand in sharpest contrast to the case at bar where the challenged witnesses, so far as this case is concerned, neither saw nor heard anything which would create a traumatic neurosis or a repressed memory of a horrible sight.
Other courts have adopted various tests for admissibility based on criteria designed to measure the integrity of the hypnosis procedure, and to reduce the dangers of suggestibility, bias, incompetence, and the like, by requiring taping, prehypnotic memorialization, and other safeguards. This approach was taken in New York in People v Lewis (103 Misc 2d 881), People v Lucas (107 Misc 2d 231) and People v McDowell (103 Misc 2d 831; see, also, State v Hurd, 173 NJ Super 333, affd 86 NJ 525; State v Pearson, supra; Use of Hypnosis to Refresh Memory: Invaluable Tool or Dangerous Device? 60 Wash U LQ 1059, referring to Hurd safeguards of Dr. Martin Orne; see Orne, Use and Misuse of Hypnosis in Court, 27 Int J of Clin and Exp Hypnosis, No. 4, pp 311, 335 [1978]; and to articles and views of Dr. Herbert Spiegel, who testified before us at this hearing; see, also, Schafer and Rubio, Guidelines for Use of Hypnosis with Witnesses, Int J Clin and Exp Hypnosis [April, 1978]).
In looking to the Frye test, Maryland, in Polk v State (48 Md App 382; see, also, State v Temoney, 45 Md App 569, vacated on other grounds 290 Md 251), modified the stance it took in the seminal case of Harding v State (5 Md App 230, cert den 252 Md 731, cert den 395 US 949), but did not direct the trial court to give the procedure passing or failing grades under Frye (293 F 1013, supra),[10] and then recently restricted its use further, overruling Harding and *756 adopting the Hurd (supra) guidelines (Collins v State, 52 Md App 186).
III
THE MINORITY VIEW
A number of jurisdictions have refused to accord hypnosis the level of “general acceptance” for forensic purposes, and have rejected testimony based on a hypnotically reconstituted memory, e.g., Pennsylvania (Commonwealth v Nazarovitch, 496 Pa 97), Minnesota (State v Koehler, 312 NW2d 108; State v Mack, 292 NW2d 764), and Michigan (People v Tait, 99 Mich App 19, supra; People v Gonzales, 108 Mich App 145). Arizona seems less clear (State v Mena, 128 Ariz 226, as compared with language in State ex rel. Collins v Superior Ct. of State of Ariz., 132 Ariz 180).
IV
THE HUGHES CASE AND THE SCOPE OF EXCLUSION, AS OPPOSED TO DISQUALIFICATION
It is critical to note that the courts which have, as a minority, excluded testimony generated by hypnotically expanded memory, have not suggested — and indeed state to the contrary — that a witness who has undergone hypnotic induction is unalterably barred from the courtroom. Even the exclusionary cases distinguish between so much of the memory and recitation as was induced by hypnosis, as against that which the witness was able to recite beforehand. The task may not always be easy, and at least one commentator has urged that it is impossible to discern which is which (Diamond, Inherent Problems in Use of Pretrial Hypnosis on a Prospective Witness, 68 Cal L Rev 313), and that an irreversible taint attaches, requiring the total nullification of the witness.
This view represents a minority within a minority, and appears to have no support beyond People v Shirley (31 Cal 3d 18).
Apart from Shirley (supra), even the minority (exclusionary) view cases do not flatly rule out the prehypnotic parcel, to the extent that it can, if possible, be delineated. In some cases the task may concededly be insuperable, *757 particularly where there has been suggestion, overreaching, or comparable features.
In the case at bar, each witness steadfastly proclaimed that his or her memory of the events was no better after hypnosis than before.[11] While any subject’s perceptions as to these comparisons must be taken with some reservations, they are not irrelevant and, if anything, come down on the side of admissibility (Connolly v Farmer, 484 F2d 456).
The Hughes case (88 AD2d 17, supra), though in the minority in excluding all but the prehypnotic recall, may very well emerge as the law of this State. For purposes of this decision, the court will assume that it is, and makes this observation: After hearing the proposed witnesses recount the events of May 15, 1981, the court concludes that the effects of the hypnotic process on each of the witnesses were either nonexistent or so benign as to be at most negligible.
In this regard, the case at bar most closely resembles Merrifield v State (_ Ind _, 400 NE2d 146), in which witnesses’ proposed testimony had a definable, independent, prehypnotic basis (accord Strong v State, supra; State v Greer, supra; Connolly v Farmer, supra; see, also, Commonwealth v Juvenile,_ Mass __, 412 NE2d 339). This is in sharp contrast to Hughes (supra), where the rape victim’s “recall” was dramatically aided or “revived” by hypnosis, possibly by sodium pentothal,[12] and, at least arguably, by suggestion, resulting in a crucial identification. At bar we have no markedly different posthypnotic versions, no crucial, “unlocked” identifications, no traumatized victims, no sodium pentothal, and no evidence of hypnotic or posthypnotic compliance or suggestion.
In each instance, the court has examined a prehypnosis statement made or given by the witness, describing the events about which he was to be hypnotized. In each *758 instance, the differences were trifling, and as might be expected when any dispassionate witness repeats an account with only minor, trivial variations. The witnesses were not “frozen in” to any version, and expressed the same levels of doubt and amenability to cross-examination as ordinary witnesses. Accordingly, the court sees no occasion to go beyond the Hughes case such as to totally disqualify the witness from testifying — a remedy possibly appropriate in the case of hypnotic procedure excesses not here present (see Dilloff, Hypnotically Influenced Testimony, 4 Ohio Northern U L Rev, No. 1).
V
CONFRONTATION
Most of the decisions have been couched in evidentiary terms, but the court sees this issue as one of constitutional dimension. The alteration of one’s mind, or its invulnerability to cross-examination, due to hypnotic suggestion, lies at one end of the problem, as distinct from the fears which courts have rightfully expressed when a witness, having been traumatized, remembers little or nothing until he experiences ab-reaction, to use a Freudian term, in which the memory is resurrected from darker layers of the mind.
The constitutional right to confrontation is basic, and should not be compromised by hypnotic procedures. When asked to address the issue, courts have found no Sixth Amendment violation under circumstances far more dramatic than these (State v Pearson, supra; United States v Miller, 411 F2d 825, supra; People v Smrekar, supra; United States v Adams, supra; see, also, People v Perrino, NYLJ, May 15, 1981, p 16, col 2, [Nastasi, J.]). Where violations have been said to exist, as in the Arizona and Minnesota cases, they were by-products of highly suggestive procedures in cases where victims were spectacularly refreshed.
None of those elements is present here. The court has consulted the interviews themselves and is inclined to agree with the testimony of Dr. Spiegel, the only expert called at the hearing, that Joseph Czaplicki, in questioning the subjects, was impeccable and fastidious in his manner *759 and approach. His inquiries of the witnesses are models of nonleading questions, and reflect no bias or implantation. This is an important finding, because of the writings which argue that a hypnotized person is more receptive to suggestion than others (Putnam, Hypnosis and Distortions in Eye Witness Memory, 27 Inti J Clin & Exp Hypnosis 437, 444).
After being told that the defense perceives no substantial difference between the prehypnotic and posthypnotic testimony of some of the witnesses, the court asked the defense to point out disparities where the defense does claim them to exist. Even after the court continually pressed the issue, the defense either could not or would not point out any disparities (claiming that to do so would impair its cross-examination).[13] The court concludes that there are no consequential differences involved in the prehypnotic, hypnotic, and posthypnotic accounts of any of the witnesses, such as may have been caused by hypnosis. The defense is seeking what amounts to witness nullification in a case which does not call for it.
VI
DUE PROCESS
A challenge to potential witnesses who have been subjected to hypnosis has due process implications, in addition to Sixth Amendment confrontation issues.
Although the motion is not, strictly speaking, brought under the statutes which govern the procedure suppressing identification testimony (CPL 710.20, subd 5; 60.25), there are constitutional parallels. The defense claims that the witnesses were subjected to suggestive (in this case, hyp *760 notic) procedures, while the prosecution asserts that each witness has a reliable, discrete, and independent basis for his or her testimony.
Under standards involving due process in eyewitness identification the court, in measuring the likelihood of irreparable misidentification, must determine whether suggestive procedures were employed, as balanced against factors which support an independent and reliable basis for identification (Manson v Brathwaite, 432 US 98; Neil v Biggers, 409 US 188; People v Adams, 53 NY2d 241; Dickerson v Fogg, 692 F2d 238; People v Haynes, 88 AD2d 1070).
While these inquiries are similar, in constitutional terms, to those at bar, the court is not prepared to borrow the standard (Simmons v United States, 390 US 377) by which the suppression of identification testimony results upon “a very substantial likelihood of irreparable misidentification” (see Admissibility of Polygraph and Hypnotic Evidence to Test Credibility of a Witness, 1982 Detroit Col of L Rev 97, 115).
If the court were to apply a far stricter standard than “probability of irreparable misidentification,” the challenge must fail, because here the proof does not support even a “reasonable possibility” of memory distortion or disturbance of their true memories due to hypnosis — and stands as the converse of a memory or identification created or manufactured by confabulation or suggestion (cf. Foster v California, 394 US 440).
One court has suggested that the burden be placed on the prosecution to establish the viability of proposed hypnotically revived evidence (Commonwealth v Juvenile,_ Mass _, 412 NE2d 339, 344, supra). This court is not proposing that the burden must be assigned in that manner, but has little difficulty in concluding that even under such a formulation the prosecution has here defeated any claims of hypnotically produced, altered, or frozen memories.
VII
THE TAPE ERASURE
This court is convinced that the missing portion of the Hinson tape was erased inadvertently. Although the court *761 is able to compare her prehypnotic and posthypnotic statements, and to easily conclude that there is no meaningful difference, we cannot, on an empty record, be the guarantor of all that took place at her May 27, 1981 hypnotic session. Hence, the People must bear the consequences of the loss, unintentional though it was (cf. United States v Bryant, 439 F2d 642), in proportion to the circumstances. The court must therefore assess and impose the appropriate sanction (People v Saddy, 84 AD2d 175; Montgomery v United States, 384 A2d 655, 662 [DC App]) and rules that Hinson is precluded from testifying, except to the extent that she may make the aural identification (People v Collins, 84 AD2d 35; State v Packard,__Conn_, 29 Crim L Rptr 2241, 2242; see, also, People v Allweiss, 48 NY2d 40, 48; Criminal Law — Voice Test, Ann., 24 ALR3d 1261). This court finds that Hinson’s ability to identify or not identify defendant’s voice has nothing to do with the hypnotic session. The identification was made at a voice lineup on January 4, 1982, in the presence of counsel, who actually selected the order of taped voices. Never having heard defendant’s voice before or after, there can be no possibility of suggestibility because Hinson simply picked out a voice, eight months later, without knowing whose it was. All the hypnotic prompting or posthypnotic suggestion in the world could not endow her with the capacity, eight months later, to pick out the voice of an individual whom she did not know, particularly when defendant’s attorney selected the sequence of voices. Even the Shirley court makes allowance for the capacity of a witness to testify about subjects not covered under hypnosis.
The other Wade witnesses (Kevin Hughes, Alfredo Diaz, and Bobbi Jo Waring) all made lineup identifications which, as the defense has candidly conceded, raised no constitutional violation. In all instances these lineups were fair, nonsuggestive, and for the most part, involved confirming the identity of someone whom they already knew, if not by name. Thus, there was not only an absence of any danger of misidentification and not the slightest hint of overreaching, but a clearly independent basis as well.
In conclusion, this court denies the motion to nullify the witnesses Rahilly, Diaz, Waring, Banker, and Bo.urgal, *762 and holds that they be allowed to testify within the parameters of the Hughes case, and that Hinson may not so testify, but is not precluded as a Wade voice witness.

. The face page of the indictment does not refer to the defendant’s being incarcerated upon a life sentence at the time of the murder. That assertion, and a recitation of the underlying convictions, is set forth in a supporting information in which the defendant is said to have received a 25-year to life sentence as a persistent felony offender in Schenectady County in 1978 (affd 77 AD2d 712, application for Iv to app granted 51 NY2d 776), and again, in 1979 was given consecutive 25-year to life sentences upon four counts of the murder of two victims in Albany County (affd 88 AD2d 173).

. That conviction was affirmed (81 AD2d 1046), six days after the May 21, 1981 interview.

. If the rule were applied here, it would foster the same result, and have the added, ironic, consequence of placing an additional layer of insulation around any prisoner who can manage to keep alive all manner of litigation, be it CPLR article 78 proceedings, parole denial challenges, review of disciplinary proceedings, habeas corpus, and other legal matters which already appear, in the thousands, on increasingly lengthy calendars at Special Term Parts, in State correction facilities. The expansion of People v Rogers (48 NY2d 167), et al., to automatically encompass noncustodial questioning of prisoners who have counsel in unrelated cases would not only encourage frivolous litigation, but would have a debilitating effect on the State’s capacity and obligation to keep its correctional facilities as free of crime and violence as possible.

. As for constitutional distinctions between a prison disciplinary proceeding, on the one hand, and an investigation with a threat of criminal prosecution on the other, see Clutchette v Procunier (497 F2d 809, 823, revd sub nom. Baxter v Palmigiano, 425 US 308).

. For this reason, it is unnecessary for the court to determine whether the police, on May 21,1981, were on “notice” as to the existence of Mr. Adang, based on the proof that Adang’s representation was known to Lieutenant Struck, a Green Haven correction officer, who was at least peripherally involved in the investigation (cf. People v Gomez, 90 AD2d 458, 459; People v Coles, 89 AD2d 471; People v Bartolomeo, 53 NY2d 225). The issue of whether the knowledge of a correction officer, as a member of a separate coordinate department, is imputable to the police, for Bartolomeo purposes, is not reached (see People v Moore, 79 AD2d 619). Nor need we decide whether, for Sixth Amendment purposes, “a pending case” is deemed to include an appeal from a judgment of conviction in which the sentence has, of course, been imposed (People v Harris, NYLJ, Nov. 9, 1982, p 21, col 4 [Schwartzwald, J.]; People v Jacobs 115 Misc 2d 954).

. No one proved that the message was or was not delivered. After being reminded that no proof was offered as to delivery, the People, who have a heavy Huntley burden, were not able to produce any witness who could attest to having delivered the message. Because the officials were in control, the law places upon them a responsibility for maintaining an internal monitoring system to convey knowledge of the entry or attempted entry of attorneys into the case (People v Garofolo, 46 NY2d 592, 600-601). The court cannot assume that the message was delivered, and must, if anything, presume the contrary on this record.

. Compare People v Brown (82 Misc 2d 115) where, unlike here, the defendant was not afforded privacy while unburdening himself to a clergyman in a conversation overheard by a nearby custodial officer. At the other end of the spectrum is a communication by a defendant requesting a clergyman to get in touch with the Federal Bureau of Investigation — a request which clearly fractures any later claim of privilege (United States v Wells, 446 F2d 2).

. For a discussion of its historical development, see Note, Admissibility of Testimony Influenced by Hypnosis (67 Va L Rev 1203; Testimony by Previously Hypnotized Witnesses: Should it be Admissible?, 18 Idaho L Rev 111). The subject has been considered in England (Haward and Ashworth, Some Problems of Evidence Obtained by Hypnosis, Grim L Rev, p 469 [1980]; Haylock, Hocus-Pocus, 7 Fingerprint World 38 [Oct., 1981]) and Canada (Regina v K, 10 Crim Rep 235 [Manitoba, 1979]).

. Or to have any witness testify immediately after having his testimony hypnotically “jogged” (Greenfield v Commonwealth, 214 Va 710). Attempts to have witnesses testify while under hypnosis have been exceedingly rare (see Pelanda, Probative Value of Testimony From Hypnotically Refreshed Recollection, 14 Akron L Rev 609; Regina v Pitt, 68 DLR2d 513 [Supreme Ct of British Columbia (1967)]).

. As for Frye (293 F 1013) or its equivalent, in New York, see People v Leone (25 NY2d 511) and People v Middleton (54 NY2d 42).

. It has been argued that the improvement of one’s memory cannot be convincingly attributed to the use of hypnotic trance (Wagstaff, Recall of Witnesses Under Hypnosis, 22 J Forensic Sci Soc 33 [1982]; 6 Sci in Crim Law Newsletter, No. 2 [Aug., 1982]).

. Not sanctioned in New York (see People v Ford, 304 NY 679; see, also, People v Harper, 111 Ill App 2d 204; generally Dession, Freedman, Donnelly, and Redlich, Drug-Induced Revelation and Criminal Investigation, 62 Yale LJ 315).

. Of course, the defendant will be permitted to cross-examine or otherwise argue the claimed consequences of hypnosis. Under the facts of this case there is no denial of confrontation (Ohio v Roberts, 448 US 56; Lawson v State, 280 NW2d 400, 405 (Iowa); People v Tait, 99 Mich App 19).
On the issue of credibility, there is little dispute that a person under hypnosis may still willfully lie or withhold facts (Loftus and Loftus, On Permanence of Stored Information in Human Brain, 35 Am Psychologist, 409, 415 119801; Altman & MacLeod, Hypnotism: Its Utilization in Criminal Law, 54 NY State Bar J 377). The court, at the appropriate time, will entertain requests to charge the jury as to the evaluation of testimony from previously hypnotized witnesses (Wyller v Fairchild Hiller Corp., 503 F2d 506, 509; Greenblatt, Law Governing Use of Evidence Obtained Through Hypnosis, NY State Div of Grim Justice Servs 119821; a suggested instruction is offered by Spector and Foster, p 595, n 141).