OPINION OF THE COURT
Irving Lang, J.
Does the failure to follow the guidelines enunicated in People v Hughes (59 NY2d 523) automatically preclude the use of identification testimony of a witness who has been hypnotized?
background
On June 8, 1980, Raymond Alberti, Sr. was shot in his Co-op City apartment and instantly killed. For almost three years, the police had no suspects in the homicide. On March 25, 1981, in order to aid in the investigation, Mr. Alberti’s wife, Eleanor, and son Keith, who both witnessed the killing, were hypnotized by a sergeant from the police department. The purpose of the hypnosis sessions was to obtain additional details about the crime.
No significant leads were uncovered until the summer of 1983. In August, Mrs. Alberti began receiving a series of anonymous phone calls pertaining to the homicide. During one conversation, the caller told Mrs. Alberti that the person who killed her husband worked at the Daisy Dry Cleaners in The Bronx. On August 13, 1983, Mrs. Alberti and Keith went to that location and identified the defendant as the shooter. Kevin Eybergen was arrested and charged with murdering Raymond Alberti, Sr.
Defendant moves to suppress the identification testimony of Keith and Eleanor Alberti on two grounds:
(1) that the hypnosis sessions were not conducted in accordance with the safeguards set forth in People v Hughes (supra), thereby rendering their identification testimony unreliable (defendant makes the broader, albeit related argument that any witness who has been hypnotized is incompetent to testify because the very basis of hypnosis is suggestion, there is a danger of confabulation, and the increased confidence that the witness experiences in the identification as a result of the hypnosis makes meaningful cross-examination impossible);
*3 (2) that the anonymous phone calls received by Mrs. Alberti were so impermissibly suggestive as to render any identification suspect.
A combined Hughes — semi- Wade hearing was conducted to address these issues. Eleanor Alberti, Keith Alberti, Detective James Brennan, Sergeant Timothy Byrnes, Officer Anthony Pezzullo and Dr. Stanley Fisher testified on behalf of the People. The following facts were adduced at the hearing.
I. FACTS
(A) The Homicide
On Sunday, June 8, 1980, at approximately 9:45 p.m., the doorbell rang at the Co-op City apartment of Raymond Alberti, Sr. and Eleanor Alberti. Keith, the Albertis’ son, was in his bedroom with two friends, David Rivera and Isreal Rodriguez. Keith answered the door, at which point he found himself face to face with a white male brandishing a rifle. Three more armed men (one white, two black) came running down the hall, and all four burst into the Albertis’ apartment.
Mrs. Alberti, hearing a scuffle, emerged from her bedroom. Upon seeing the intruders, she ran back to wake up her husband. They both went out to the foyer area; approximately five- to six-feet away stood the man with the rifle. He remained there, facing Mrs. Alberti, for approximately two minutes. At this time, Mrs. Alberti kept saying to herself "I have to remember this face.” She noticed his extremely sharp features, long face, slanted eyes and scraggly, medium dark brown hair.
David Rivera, Keith’s friend, ran into Mrs. Alberti’s bedroom to dial 911. The second armed white man ran into the kitchen, and tore the phone off the wall. The individual with the rifle ran from the foyer area toward the back of the apartment into the bathroom, where Keith’s other friend, Isreal, was hiding. He then looked in the remaining bedrooms, and returned to the foyer.
At this point, Mr. Alberti took a step forward. The man with the rifle cocked the gun, exclaiming "stay back, it ready.” The four men backed out of the apartment; the last one to leave was the man with the rifle, which he pointed at the Albertis as he left. After the apartment door was closed, Mr. Alberti left his wife’s side and walked toward the door. Keith moved up beside his father. Suddenly two shots rang out. Both *4 Keith and Raymond, Sr. went down — Keith was unharmed; Raymond, Sr. was killed from a rifle shot to the shoulder and head.
(B) The Initial Investigation
At approximately 10:15 that evening Detective James Brennan arrived on the scene. Keith told the detective what had transpired. A few days later, Mrs. Alberti gave the detective a description of the man with the rifle.
In July 1980, Mrs. Alberti, Keith, David Rivera, and Isreal Rodriguez went to a police artist, in order to participate in the drawing of a composite sketch of the shooter. All four witnesses worked together and voiced their opinion of the description of the man with the rifle. The sketch which was finally drawn was a consensus of the way most of the witnesses believed the shooter looked. (Keith indicated to the artist that he was not completely satisfied with the finished product.)
(C) The Hypnosis Sessions
On March 25, 1981, Keith and Eleanor Alberti, accompanied by Detective Brennan, went to the hypnosis unit at One Police Plaza. The purpose of the hypnosis sessions was to refresh the witness’ recollection of the incident and to possibly provide additional information to aid in the investigation. The hypnosis was conducted at the suggestion of Detective Brennan’s commanding officer. The hypnotist was Sergeant Timothy Byrnes, a hypnosis technician and chief of the hypnosis unit of the New York City Police Department.
Keith underwent hypnosis first; Mrs. Alberti was hypnotized in a separate session immediately thereafter. The procedures were audiotaped, and Detective Brennan was in the hypnosis studio during the two sessions.[1] Before inducing hypnosis, Sergeant Byrnes asked the subjects to describe exactly what occurred at approximately 9:45 p.m. on June 8, 1980. The subject’s narrative at this point is known as the prehypnotic *5 (or preinduction) statement. During Keith’s prehypnotic statement, he described the circumstances surrounding the homicide, but was neither asked, nor offered any description of the individual carrying the rifle. In Mrs. Alberti’s preinduction statement, she related the facts of the shooting and described the man with the rifle in great detail.[2]
The sergeant then induced the hypnosis. He asked the subjects to imagine that they were entering a memory room where every memory they had ever had was recorded on a video tape cassette accurately and concisely. He instructed them to pull the cassette marked June 8, 1980, and plug it into the television set, which could be adjusted so the picture is crystal clear. The subjects were then asked to describe the events surrounding the homicide. Mrs. Alberti’s description of the shooter while under hypnosis was practically identical to her prehypnotic account.[3]
During Keith’s session, when asked about the facial features of the shooter, he described a white male with brown hair, brown eyes, red lips, high cheekbones and bulging eyes. The sergeant directed Keith to burn that image vividly into his mind. At some point during this session, Detective Brennan brought to the hypnotist’s attention the fact that a composite sketch had previously been drawn and that Keith was not satisfied with it. After Keith was brought out of the hypnotic trance, the sergeant asked Keith to compare the image which he had in his mind of the shooter, with the composite. Keith indicated that the sketch should be modified as to almost every feature (chin, eyes, hair, mouth). The sergeant directed Keith to go with Detective Brennan to the police artist, in order that a second sketch be made. (The second sketch concededly looks much less like the defendant than does the first.)
On several occasions between 1980 and 1982, Detective Brennan showed the witnesses various photo arrays. In one instance, in September 1982, a photograph of defendant Eybergen was included in an array. None of the witnesses identified the defendant as having participated in the homicide.
*6 (D) The Anonymous Phone Calls
In early August 1983, Mrs. Alberti received an anonymous telephone call from an individual who claimed that he was from the "Crime Stoppers”. The caller said that he had information about Mr. Alberti’s death and that he was going to help track down the killers. Within the next week, Mrs. Alberti spoke with the caller several times. He gave her the names of persons who he thought participated in the crime, and a brief description — for example, whether they were white or black.
On August 11, 1983, Mrs. Alberti received another phone call. This time the caller told her that the person who held the rifle and shot her husband worked at the Daisy Dry Cleaners on Boston Road and Fish Avenue. He also told her that the shooter’s name was Kevin, that he was white, and that he had light hair. The caller also indicated that Chris, Kevin’s brother, might have been involved.
The following morning, August 12, Detective Brennan drove Mrs. Alberti to the Daisy Cleaners. She went into the cleaners with some old clothes, and remained there for a brief time. Not recognizing anyone, she returned to the detective’s car. That evening, Mrs. Alberti received another phone call. The caller asked her if she had seen the shooter at the cleaners; she replied that she hadn’t. The caller reassured Mrs. Alberti, stating "believe me, he’s there.” He suggested that she return to the store once again.
The next day, August 13, Mrs. Alberti followed that suggestion. When she entered the store, Mrs. Alberti saw one or two customers, and a woman behind the counter. Approximately 10 feet behind the counter she spotted the defendant. He was the only white male employee in the store at the time. Mrs. Alberti immediately called the police. She spoke with Detective Anthony Pezzullo, and told him that she spotted the man who shot her husband. Detective Pezzullo and fellow officers met Mrs. Alberti and took her back to the Daisy Cleaners. There, she pointed out defendant as the shooter. Eybergen was arrested and charged with the murder of Raymond Alberti, Sr.
H. HYPNOSIS — THE JUDICIAL RESPONSE
The dangers of introducing hypnosis into the judicial setting have been examined in detail. (Orne, The Use and Misuse of Hypnosis in Court, 27 International J of Clinical and Experi *7 mental Hypnosis No. 4, at 61, 85; Scientific Status of Refreshing Recollection by Use of Hypnosis, 253 JAMA No. 13, at 1918 [Apr. 5, 1985]; People v Hughes, 59 NY2d 523, 536, supra.) Basically these concerns are that hypnosis involves suggestibility, and may cause confabulation and increased confidence on the part of the subject (without a concomitant increase in accuracy).[4]
Courts which have considered whether to admit hypnotically derived testimony have reached diverse results. Only one jurisdiction, California, has embraced a total exclusionary approach. In People v Shirley (31 Cal 3d 18, 641 P2d 775), the Supreme Court of California held that once an individual has been hypnotized, the hypnosis permanently impairs his ability to testify for any purpose since it is impossible to separate a witness’ prehypnotic memory from that which emerged as a function of hypnosis. In contrast, the majority of jurisdictions (as well as the Federal courts) has held that hypnotically refreshed memory may form the basis of testimony; the jury is to consider the problems attendant to hypnosis in determining the weight of such evidence. (People v Smith, 117 Misc 2d 737, 754.)[5] Still, other courts have taken the view that prehypnotic recall is admissible, whereas testimony dealing with memory which was generated by the hypnosis session is not. (People v Smith, supra, at p 756; People v Lucas, 107 Misc 2d 231; People v Hughes, supra, at p 539.)[6] Finally, other States have adopted a "totality of the circumstances” approach, whereby *8 admission of hypnotically refreshed recall is determined on a case-by-case basis, and is contingent upon adherence to certain guidelines, which presumably minimize suggestibility and bias and preserve the integrity of the hypnosis process. (State v Hurd, 173 NJ Super 333, 414 A2d 291, affd 86 NJ 525, 432 A2d 86; People v Smith, supra, at p 755; People v Hughes, supra, at p 543, n 33.)
New York’s highest court has established a separate and distinct approach.
THE HUGHES DOCTRINE
In People v Hughes (59 NY2d 523, supra) the Court of Appeals ventured into this unsettled area and confronted the problems of admitting testimony of witnesses who were previously hypnotized. In Hughes, the victim was raped in the yard behind her home. When interviewed at the hospital, she gave no information to the authorities. However, after an independent investigation, the police quickly determined that defendant was their prime suspect. The victim subsequently agreed to undergo hypnosis to aid in her ability to recall her attacker. Sometime prior to the hypnosis session, the victim’s husband told her that the police suspected the defendant to be the perpetrator. While in a hypnotic state, the victim identified the defendant as her attacker. At trial, the victim testified to the events as recalled both prior to and following the hypnosis sessions, and identified the defendant as the perpetrator. The jury found the defendant guilty of rape and related crimes. The Appellate Division reversed, in an opinion which was affirmed by the Court of Appeals.
After examining the holdings of the various jurisdictions, Judge Wachtler adopted a "middle of the road” approach. He first noted that the following guidelines have been proposed by the experts regarding the procedures to be followed during the hypnosis session:
(1) Hypnosis should be performed by a psychiatrist or psychologist with special training in its use;
(2) the hypnotist should not be told about the facts of the case verbally. He should receive a written memo, specifying whatever facts he is to know. He should avoid all communication which might affect his opinion;
(3) the hypnotist should be an independent professional having no involvement in the investigation and having no responsibility to prosecutors or investigators;
*9 (4) all contact between the hypnotist and the subject should be videotaped;
(5) prior to induction, a brief evaluation of the subject should be made. In this regard, the witness or victim should give a detailed description of the facts as he remembered them. In this way, a record is made of the witness’ beliefs before hypnosis. Only after this has been completed should the hypnosis session be initiated;
(6) no one other than the psychologist or psychiatrist and the subject should be present in the room before and during the hypnosis session. It is all too easy for observers to wittingly or unwittingly communicate to the subject what they expect or are startled by.
Adherence to these standards would, according to Judge Wachtler, provide merely a partial solution, and does not ensure reliable recall under hypnosis. This is so because the guidelines deal primarily with the conduct of law enforcement officials and the hypnotist. The major problem, however, the court reasoned, is the individual being hypnotized. (People v Hughes, supra, p 544.) There is simply no way to eliminate the risk that the subject will confabulate. Thus, the Court of Appeals held that if a witness has been hypnotized before trial, he may not testify as to events recalled after the hypnotic sessions. However, pretrial use of hypnosis does not necessarily render the witness incompetent to testify as to events recalled prior to being hypnotized. That is, the extent of the witness’ prehypnotic recollections establishes the boundaries of admissible testimony. However, the court stressed the following caveat — testimony with respect to prehypnotic recollection must be suppressed if the hypnosis session was impermissibly suggestive. These two variables (1) the extent of the witness’ prehypnotic recollection and (2) the propriety of the hypnosis session, are to be assessed at a pretrial hearing. In order to determine whether the integrity of the hypnosis session itself was in any way compromised, the court suggests referring to the proposed guidelines. The burden rests with the People to demonstrate by clear and convincing evidence, that the testimony of the witness as to prehypnotic recollection will be reliable, and that there has been no substantial impairment of defendant’s right to cross-examination.[7]
*10 Applying these standards to the facts before it, the Hughes court held that it was error to allow the victim to testify to events recalled after hypnosis. A hearing was ordered to consider the question whether the witness’ prehypnotic recollection was unduly influenced by the hypnotic sessions.[8]
THE NONSUSPECT CASE
The Hughes doctrine has been applied in a variety of contexts. (See, People v Smith, 117 Misc 2d 737, supra; People v Tunstall, 63 NY2d 1.)
None of these cases, however, addresses the issue at bar. This case presents, for the first time since Hughes (supra), the unique situation where hypnosis is employed by the police before a suspect has surfaced, where the hypnosis is not performed in accord with the suggested guidelines, and where the identification of the defendant by the previously hypnotized witnesses is made over two years after the hypnosis. Does Hughes dictate suppression of testimony relating to prehypnotic recollection and subsequent identification in all instances, if the proposed standards are not followed? A careful examination of Hughes suggests that it does not.
A pivotal distinction was cited by the Court of Appeals between the "classic case where the police had no suspect and needed to employ hypnosis in order to obtain leads for further investigation”, and those where the police do have a suspect and the victim’s recollections under hypnosis merely reinforce or validate the suspicions of the police. (People v Hughes, supra, pp 544-545.) When the police have a suspect, there is obviously a great danger that the hypnotist, wittingly or unwittingly, will transmit cues to the subject, thereby making the subject privy to police suspicions and suggestions. However, the dangers of suggestibility and communication to a *11 subject regarding a possible suspect simply do not exist when there is no suspect.
Thus, logic dictates that, absent extraordinary circumstances, in a suspect case, if the proposed safeguards are not followed, then statements as to prehypnotic recollection and subsequent identification must be suppressed. However, in a nonsuspect case, failure to adhere to the safeguards does not automatically render such testimony inadmissible. Rather, in the nonsuspect case, the question whether prehypnotic recall and subsequent identification are unduly influenced by the hypnotic session must be decided on a case-by-case basis, taking into account a confluence of factors, including the strength and scope of the subject’s unaided recollection, and the events which transpired prior to and during hypnosis.
Applying this reasoning, I make the following findings with regard to the hypnosis session of Eleanor Alberti. It is apparent that most of the safeguards referred to in People v Hughes (supra) were not followed — the hypnosis was conducted by an employee of the police department, as opposed to an independent psychiatrist or psychologist; the session although audio-taped, was not videotaped; the officer in charge of the investigation was in the room during the session, and the hypnosis was conducted at police headquarters, and not in a neutral setting. Notwithstanding these deficiencies, in a nonsuspect case such as this, additional factors must be considered. These additional factors, in the case of Eleanor Alberti, all indicate that the hypnosis had a benign effect, if any, on her ability to recall the incident and identify the defendant. Initially, Mrs. Alberti offered a very detailed prehypnotic statement, indicating that she had a vivid recollection of the events of June 8, 1980, including a well-established memory of the individual with the rifle. In addition, her preinduction statement was in all significant respects consistent with her posthypnotic account. According to Dr. Stanely Fisher, the expert at the hearing, this indicates that there was little, if any, possibility of confabulation. Moreover, the hypnosis session did not serve to bolster Mrs. Alberti’s confidence to any significant degree. I find that there is no reason to doubt her statement that she was no more confident of her identification prior to hypnosis than subsequent to it.
Notably, as she viewed the incident on June 8, Mrs. Alberti rehearsed in her mind the description of the man with the rifle, and kept repeating it over and over. Such rehearsal, in *12 the view of Dr. Fisher, is one of the most effective means of committing information to memory.
Finally, I note that, in September 1982 Mrs. Alberti failed to identify the defendant as a perpetrator when the detective displayed Eybergen’s picture in a photo array. This is similarly an indication that the hypnosis had no perceptible impact on her subsequent identification.
Thus, although the proposed guidelines were not exercised during the hypnosis session of Mrs. Alberti, that failure is not determinative in this nonsuspect situation. I find that the hypnosis had virtually no effect on Mrs. Alberti’s prehypnotic recollection and did not enhance her certainty in the accuracy of her memory. The People have established by clear and convincing evidence that defendant’s right to cross-examine Mrs. Alberti was in no way impaired and that the hypnosis did not effect her identification at the Daisy Cleaners.
On the other hand, the hypnosis session of Keith Alberti presents a different situation. Adherence to the suggested safeguards was woefully inadequate. This would not necessarily be fatal in a nonsuspect case. However, several crucial factors compound the problem. Most importantly, in his prehypnotic statement, no description was elicited from Keith regarding the man with the rifle. This omission is critical because, the very purpose of the initial preinduction description is to assess what information is established in the memory before the hypnosis session and, therefore, which areas are likely to be sources of confabulation. Without knowing the extent of unaided memory, it is simply impossible to measure what is remembered independent of the hypnosis. Thus, in a nonsuspect case, failure to adhere to the proposed safeguards which minimize suggestibility can be forgiven. What cannot be forgiven is the failure to obtain a prehynotic description, inasmuch as that is the only means of ascertaining the scope of the subject’s unassisted memory.
As Dr. Fisher noted, during the hypnosis session, Keith was asked certain leading questions with regard to the intruder’s facial features. Consequently, there was a likelihood that Keith "filled in the blanks,” or created answers in response to those questions. Indeed, the likelihood that Keith confabulated becomes stronger when one considers the curious second sketch. It appears that there was some communication between the hypnotist and Detective Brennan regarding the first composit sketch, and somehow, the hypnotist became aware *13 that Keith’s description while under hypnosis was at odds with that drawing. When Keith was asked to modify that sketch, the second sketch was much less of a resemblance to the defendant than the first. According to Dr. Fisher, that second sketch was likely to be a product of Keith’s confabulation.
In sum, given the strong possibility that Keith juxtaposed "created memory” with "real memory”, the boundaries of his prehypnotic recollection with regard to his description of the man with the rifle cannot be calculated. The precise effect of the hypnosis on Keith’s ability to recall and identify the defendant is unknown. As such, the People have not sustained their burden.
THE ANONYMOUS PHONE CALLS SEMI-WADE BLACKMAN
The defendant contends that even if the hypnosis had not impaired Mrs. Alberti’s ability to identify the defendant, a separate ground exits for suppressing her identification testimony. Defendant argues that the anonymous phone calls received by Mrs. Alberti which prompted her to go to the Daisy Cleaners were so suggestive as to render any identification flowing therefrom impermissibly suspect.
In People v Blackman (110 AD2d 596 [1st Dept 1985]) the Appellate Division held that the trial court may, in its discretion, conduct a hearing to determine whether identification testimony is sufficiently reliable for submission before the jury even if the procedure at which the defendant was identified was arranged by a private citizen without police participation. This is so, because the essence of the Wade decision is reliability and not deterrence of police conduct. (United States v Wade, 388 US 218.)
Given that "reliability is the linchpin in determining the admissibility of identification testimony” (Manson v Brathwaite, 432 US 98, 114), the question is whether the anonymous phone calls so influenced Mrs. Alberti as to render her identification of the defendant at the dry cleaners unreliable as a matter of law.
It is obvious that the calls she received — in essence that the man who killed her husband worked at the Daisy Cleaners— were suggestive. It is also true that on the day Mrs. Alberti identified the defendant, he was the only white male employee present. However, the description which she received of the defendant by the anonymous caller was of a white man with *14 light hair. Significantly, defendant does not fit that description and it did not conform to Mrs. Alberti’s recollection of what the defendant looked like. In addition, Mrs. Alberti credibly testified that, although she hoped to find the shooter at the cleaners, the phone calls did not make her certain that she would.
In sum, although the anonymous calls were suggestive, they did not cause Mrs. Alberti to make an identification. Accordingly, I find that her testimony regarding her viewing the defendant at the cleaners is sufficiently untainted to be submitted to the jury.
CONCLUSION
The guidelines enunciated by our highest court in Hughes (supra) are designed to address three potential problems created by hypnosis — suggestibility, confabulation, and confidence.
It is essential that a prehypnotic recollection be adduced to enable the hearing Judge to determine whether the hypnosis created undue susceptibility to suggestion or resulted in confabulation. Therefore, failure to obtain prehypnotic recollection would ordinarily be fatal to any posthypnotic identification. Where the court finds a confabulation, any subsequent identification should be suppressed. Provided that there was a prehypnotic recollection, a failure to comply with the other guidelines is not necessarily fatal to a later identification where there was no suspect at the time of the hypnosis.
The problem of increased confidence by the subject after hypnosis seems to me to be greatly exaggerated, no different than the standard "I’ll never forget that face” or "There is no doubt in my mind”, that victims ordinarily relate. (See, discussion of Putnam, Hypnosis and Distortions in Eyewitness Memory, op. cit.)
Certainly in the instant hearing, the confidence that both Keith and Eleanor Alberti may have had in their testimony did not impair the effectiveness of cross-examination.[9]
The testimony of Keith Alberti is suppressed, because of the failure to adduce prehypnotic recollection and the court’s finding of a hypnotic confabulation.
The testimony of Eleanor Alberti is not suppressed.

. Prior to inducing hypnosis, Sergeant Byrnes and Detective Brennan went into a separate room, where the sergeant prepared a case data sheet, containing the name of the witnesses, the type of crime, and indicating that the witnesses were in the apartment at the time of the homicide. With regard to Keith, the detective indicated that he was looking for "any/all information relative to the incident and the man with the long gun”. With regard to Mrs. Alberti, the detective desired information relating to "a description of the perpetrators.” The case data sheet reflected all the information which the hypnotist knew about the case; he did not know whether or not a suspect had already surfaced.

. She stated that he was "a white guy with * * * curly black hair * * * curly dark hair, staring at me with this long rifle * * * I remember distinctly the one with the long gun had a long thin face, sharp features, nothing broad about him that I remember.”

. Under hypnosis, she added that he had a small mustache.

. Interestingly, in a study conducted by Dr. William Putnam, statistical analysis revealed that there is not always a positive correlation between hypnosis and increased confidence. His study showed that subjects who were not hypnotized apparently had a higher confidence rating in some instances, than those subjects who were hypnotized. (See, Putnam, Hypnosis and Distortions in Eyewitness Memory, 27 International J of Clinical and Experimental Hypnosis No. 4, at 437, 443, tables 2, 3 [1979].)

. In People v Smith (117 Misc 2d 737, 754), the court enumerated some of the States adhering to this view. They include Indiana (Pearson v State, — Ind —, 441 NE2d 468); New Mexico (State v Beachum, 97 NM 682, 643 P2d 246); Georgia (Collier v State, 244 Ga 553, 261 SE2d 364); North Carolina (State v McQueen, 295 NC 96, 244 SE2d 414); Oregon (State v Jorgensen, 8 Ore App 1, 492 P2d 312); Wyoming (Chapman v State, 638 P2d 1280); Florida (Clark v State 379 So 2d 372); Missouri (State v Greer, 609 SW2d 423); and Illinois (People v Smrekar, 68 Ill App 3d 379, 385 NE2d 848).

. These States include Minnesota (State v Mack, 292 NW2d 764); Arizona (State v Mena, 128 Ariz 226, 624 P2d 1274); Michigan (People v Gonzales, 108 Mich App 145, 310 NW2d 306); Pennsylvania (Commonwealth v Nazarovitch, 496 Pa 97, 436 A2d 170); Nebraska (State v Palmer, 210 Neb 206, 313 NW2d 648); and Massachusetts (Commonwealth v Kater, 388 Mass 519, 447 NE2d 1190).

. In this regard, the court noted that the danger of inhibiting defendant’s right to cross-examination is greatest when the hypnotist suggests to the subject that a certain event occurred or that the person will have *10 perfect recall in a normal waking state. Absent such cues, the degree of confidence gained through hypnosis hinges upon the individual’s belief in the effectiveness of hypnosis in uncovering the truth, the degree to which the subject has been hypnotized, and the extent to which the proposed guidelines have been observed.

. With respect to the hypnosis session in People v Hughes (59 NY2d 523) the court noted that the proposed guidelines were not followed — the information provided by the police to the hypnotist was not in writing, the police and the victim’s husband were present at the session, the hypnosis was not conducted in a neutral setting but was held at police headquarters, and, most importantly, the victim knew that the police had a suspect and knew that it was the defendant prior to the first hypnotic session.

. Any legitimate concern about increased confidence could be dealt with by the court in a jury charge.